366 F.3d 138
 Larry E. FEINGOLD, Plaintiff-Appellant,
v.
The State of NEW YORK, the New York State Department of Motor Vehicles, Leon Schulgasser, Kathleen A. Sullivan, Evelyn Waltrous, Sharon Lee-Sang, Fernando Tapia, Phyllis Isaacs, Other Administrative Law Judges and Employees, Defendants-Appellees.
 Docket No. 02-7985.
 United States Court of Appeals, Second Circuit.
 Argued: April 24, 2003.
 Decided: April 30, 2004.
 
 COPYRIGHT MATERIAL OMITTED COPYRIGHT MATERIAL OMITTED COPYRIGHT MATERIAL OMITTED Allegra L. Fishel, New York, New York, for Appellant.
 Robert H. Easton, Assistant Solicitor General, for Eliot Spitzer, Attorney General of the State of New York (Marion R. Buchbinder, Assistant Solicitor General, on the brief), New York, New York, for Appellees.
 Before: CALABRESI, F.I. PARKER,[1] and SACK, Circuit Judges.
 F.I. PARKER, Circuit Judge.
 
 
 1
 Plaintiff Larry E. Feingold ("Feingold" or "plaintiff") appeals from a decision and order of the United States District Court for the Southern District of New York (Jed S. Rakoff, J.) entered on July 31, 2002. Feingold alleged that while employed as an Administrative Law Judge ("ALJ") by the New York State Department of Motor Vehicles ("DMV") he was subjected to disparate treatment and a hostile work environment on the basis of race, religion, and sexual orientation, and was retaliated against for complaining of such discrimination. Feingold claimed that both the DMV and the State of New York (the "State") violated Title VII of the 1964 Civil Rights Act ("Title VII"), as amended, 42 U.S.C. §§ 2000e et seq., the New York City Human Rights Law, see N.Y.C. Admin. Code §§ 8-101 et seq. ("NYCHRL"), and 42 U.S.C. § 1983 ("Section 1983"). He also claimed that the named individual defendants in their individual capacities violated the New York State Human Rights Law, N.Y. Exec. Law §§ 290 et seq. ("NYSHRL"), the NYCHRL, and Section 1983. The district court granted summary judgment to defendants on all of Feingold's claims.[2] Feingold now appeals from that decision.[3]
 
 
 2
 For the reasons discussed below, we affirm in part and vacate and remand in part. We begin with a Table of Contents.
 
 CONTENTS
 I. Background
 A. Factual Background
 1. Conditions of Employment
 
 3
 2. Termination Decision and Alleged Precipitating Events
 
 B. Feingold's Claims
 C. District Court Decision
 II. Discussion
 A. Claims Against the DMV
 
 4
 1. Disparate Treatment Claims Against the DMV
 
 
 5
 a. Hostile Work Environment Claim Against the DMV
 
 
 6
 i. Evidence of a Hostile Work Environment
 
 
 7
 ii. Evidence to Impute Liability to the DMV
 
 
 8
 b. Discriminatory Workload and Discharge Claims
 
 
 9
 i. Prima Facie Case ii. Defendants' Explanation for Feingold's Firing
 
 2. Retaliation Claim Against the DMV
 
 10
 a. Prima Facie Case
 
 
 11
 b. Defendants' Rationale
 
 B. Claims Against the Individual Defendants
 1. New York State Human Rights Law Claims
 2. New York City Human Rights Law Claims
 
 12
 3. Section 1983 Claims Against the Individual Defendants
 
 
 13
 a. Equal Protection Claim
 
 
 14
 b. First Amendment Claim
 
 C. Claims Against the State of New York
 III. Conclusion
 I. BACKGROUND
 A. Factual Background
 1. Conditions of Employment
 
 15
 Feingold, a white, Jewish, gay male, alleges he was discriminated against on the basis of race, religion, and sexual orientation, while employed for approximately eight months as an ALJ by the DMV. Feingold began work at the DMV's Manhattan North Office (the "MNO") of the Traffic Violations Bureau (the "TVB") on October 28, 1999. The senior ALJ supervising the office was Judge Kathleen Sullivan ("Sullivan"), a white, Christian, heterosexual female. The other ALJs in the MNO were Sharon Lee-Sang ("Lee-Sang"), a black, Christian, heterosexual female; Fernando Tapia ("Tapia"), a black, Christian, heterosexual male; Evelyn Waltrous ("Waltrous"), a black, Christian, heterosexual female; and William Sica ("Sica"), a white, non-Jewish, heterosexual male. Also working in the office was Phyllis Isaacs ("Isaacs"), the Chief Clerk, a black, Christian, heterosexual female. The overall supervising ALJ for all TVBs in the state was Leon Schulgasser ("Schulgasser"), a white, Jewish male who worked in the neighboring Brooklyn North Office.[4]
 
 
 16
 Feingold alleges that from the time he began working at the MNO, he was subjected to hostile treatment by his African-American colleagues because of his race, religion, and sexual orientation. The MNO's training method called for more experienced ALJs to provide informal guidance to new ALJs. Feingold avers that rather than providing such assistance, the three African-American ALJs largely ignored him, and were unhelpful and even antagonistic when approached for advice. In particular, he alleges that when he asked a question of Waltrous, who was assigned to train him, she snapped at him, "I ain't nobody's teacher." As a result, Feingold contends, within one week of beginning his job, he was adjudicating contested hearings with insufficient training. Feingold alleges that this treatment was significantly different from that of Pauline Haynes, an African-American ALJ hired in May 2000, who, according to the plaintiff, received both more substantial instruction and more time to train before hearing cases.
 
 
 17
 Once he began to hear cases, Feingold alleges, he was assigned a heavier caseload than the African-American ALJs. He asserts that the African-American judges routinely arrived at work late, took long lunches, left work early, and reassigned their cases to Feingold and Sica. According to Feingold, the African-American judges were never reprimanded for this behavior.
 
 
 18
 Feingold asserts that the MNO was permeated with anti-Semitic hostility. Feingold says that, rather than addressing him by his own name, Lee-Sang, Tapia, and Isaacs would call him by other "Jewish sounding" names, such as "Feinstein," "Goldstein," "Goldman," "Silverman," and "Feinberg," often in a negative tone. Feingold also alleges that persons having business with the DMV were regularly categorized by Lee-Sang as "Jewish" or "not Jewish;" that Lee-Sang frequently referred to him as Jewish; that she treated Jewish lawyers representing parties differently from non-Jewish lawyers, remarking at least once, "Can you believe it, I got me a Jewish lawyer. I didn't even know he was Jewish;" and that a comment made by Lee-Sang regarding a conference on Holocaust reparations also demonstrated her religious insensitivity.[5] Feingold further alleges that in "nearly every" conversation that took place in his presence, Lee-Sang would say something about his religion or hers or tell stories about a Jewish person. According to Feingold, Lee-Sang also regularly proclaimed "Praise Jesus" and "Hallelujah," and asked other employees to join her in these affirmations. On such occasions, Feingold alleges that she would publicly inform him that he was excused from participating because he was Jewish. In addition, Feingold alleges that Waltrous commented negatively on Schulgasser's connections with other Jews, and that she described the food she ate at a work-related conference in the Catskills as "Jewish pig food." Feingold also asserts that Christian symbols were displayed in the office, including in public waiting areas, year-round.
 
 
 19
 Besides anti-Semitic hostility, Feingold contends that hostile attitudes toward homosexual persons pervaded the office. He alleges the words "fag" or "faggot" were used in his presence at least three times, that Sica advised him not to be "openly gay," and that Lee-Sang made at least three hostile references to his sexual orientation. In addition, he alleges that after he was terminated, he learned that a clerk referred to him as "that faggot judge" in the public area of the office.
 
 
 20
 Feingold asserts that he first complained about his treatment to a supervisor on May 24, 2000, when he told Schulgasser that he believed that he was experiencing discrimination on the basis of race, sexual orientation, and religion. When Feingold mentioned anti-Semitism, Schulgasser purportedly responded by asking "Judge Lee-Sang?", and offered Waltrous's name when plaintiff complained of racial discrimination. Feingold claims that Schulgasser admitted that Schulgasser himself had experienced anti-Semitism at the MNO, and that he advised Feingold to "sit tight" until a transfer could be arranged. Finally, Feingold alleges that, when the conversation concluded, Schulgasser indicated that he should keep quiet, saying, "Oh, and Larry, we never had that conversation, keep that in mind."
 
 
 21
 2. Termination Decision and Alleged Precipitating Events
 
 
 22
 On June 6, 2000, Feingold was in the hearing room preparing to adjudicate a contested traffic violation when he realized that he had left his judge's stamp in another room. He told the witnesses, a police officer and a motorist, to wait while he retrieved it. When he returned, the police officer was no longer present because the officer had decided to move his car.[6] Upon discovering that the police officer had left without permission and, allegedly, after waiting several minutes, Feingold entered verdicts of "not guilty" on the charges against the next two motorists on the docket because both cases required testimony from the absent officer. Defendants claim that during this proceeding, Feingold stated "they need to be taught a lesson," indicating that the "not guilty" verdicts were designed to "teach" the police officer. However, in their statement of undisputed facts, defendants admit that Feingold only said "[t]hey have to be taught something," and Feingold's affidavit states that he was referring to motorists needing to learn to go outside the hearing room to pay their fines. Consistent with this explanation, the "purported transcript" of the hearing indicates that the statement occurred after Feingold instructed a motorist to "[g]o out to the cashier and say your name." After the hearing, Feingold went to the judge's library, the room where the ALJs in the MNO have their desks. A pane in the library's glass-paned door shattered after he let go of the door. The parties dispute whether the shattering was Feingold's fault.
 
 
 23
 Defendants allege that shortly after this incident, Feingold audibly remarked in the hearing room: "I don't give a shit. Let her write me up." Feingold does not admit he made the statement, and we note that we were unable to detect this utterance on the rather muffled portion of the audio disk provided to this Court. However, the statement clearly appears in the "purported transcript" of the hearing provided in the parties' joint appendix.
 
 
 24
 On June 7, after being informed by a clerk of the events of June 6 and after listening to at least part of the recording of the relevant hearing, Sullivan conferred with Schulgasser and the two tentatively decided to recommend Feingold's dismissal. Later that day, Feingold twice telephoned Schulgasser, once to explain his version of the glass pane event and to state that he no longer felt he could tolerate working at the MNO, and once specifically to discuss his concern about discrimination on the basis of race, religion, and sexual orientation at the MNO. According to Feingold's affidavit, Schulgasser responded that if Feingold did not like working in the MNO, he should leave. Schulgasser then spoke with Sullivan about Feingold's complaint of unlawful discrimination. Sullivan apparently understood that Feingold had accused her of being "out to get him."
 
 
 25
 The district court stated that, at this point, Sullivan immediately recused herself from further involvement in Feingold's termination. However, both parties agree that after the supposed "recusal," Sullivan communicated her version of the June 6 events to DMV Assistant Commissioner Lucia Ferrara, who was Schulgasser's immediate supervisor. Moreover, Feingold alleges that Sullivan's version of the events was false and that Sullivan knew it to be untrue.
 
 
 26
 Schulgasser also contacted Ferrara on June 7 to express the view that Feingold's June 6 conduct warranted termination. Defendants admit that based on both Schulgasser's and Sullivan's recommendations, Ferrara ultimately recommended Feingold's termination to Gail Conklin, the DMV's Director of Personnel and the only person named in this opinion thus far who had the power to terminate Feingold.[7]
 
 
 27
 Less than a week later, on June 12, Schulgasser met with Feingold and told him that his conduct on June 6 was very serious and that Schulgasser was recommending Feingold's termination. Feingold responded by complaining of illegal discrimination. The next day, June 13, 2000, Feingold was formally terminated by a letter from Conklin which Sullivan delivered to Feingold. Conklin testified at her deposition that when deciding whether or not to terminate Feingold, she considered, among other things, Sullivan's and Ferrara's recommendations. Feingold attests that prior to the termination he was never given an opportunity to explain the June 6 "not guilty" determinations, or to discuss with DMV officials the discrimination complaints he had made to Schulgasser. Feingold's position was subsequently filled by a Christian, heterosexual, African-American woman.
 
 B. Feingold's Claims
 
 28
 On April 23, 2001, Feingold filed the present complaint. He sued each of the named individual defendants[8] in both their official and individual capacities, the DMV, and the State, alleging that the State was "responsible for the practices, policies, and customs of the DMV, as well as the hiring, screening, training, supervising, controlling and disciplining of those persons employed by the DMV." His complaint alleged that the defendants had violated his First Amendment rights, his constitutional right to equal protection of the laws, Title VII, the NYSHRL, and the NYCHRL, and requested both money damages and injunctive relief. Although the caption of this case lists "other Administrative Law Judges and employees" as defendants, the roster of parties in Feingold's complaint does not include any such unnamed individuals.
 
 
 29
 On August 20, 2001, Feingold entered into a stipulated agreement with the defendants to withdraw with prejudice all Section 1983 claims for money damages against the defendants in their official capacities, all Title VII claims against the named individual defendants, and all claims under the NYSHRL against the DMV, the State, and the named individual defendants in their official capacities.
 
 
 30
 Subsequently, at oral argument before the district court on February 6, 2002, Feingold agreed to dismiss all claims for money damages against the DMV, the State, and the individual defendants in their official capacities. In addition, he agreed that his First Amendment claims against Lee-Sang, Isaacs, Tapia, and Waltrous could not stand. Feingold's counsel also clarified that the plaintiff did not claim that the alleged discrimination on the basis of sexual orientation violated Title VII.
 
 C. District Court Decision
 
 31
 The district court granted summary judgment to defendants on Feingold's claim that his termination was discriminatory. It held that the plaintiff had "failed to offer any competent evidence to rebut defendants' substantial showing that [Feingold's] termination was the result [of] independent, non-discriminatory events." The district court also found that defendants had stated a non-discriminatory reason for Feingold's termination and that Feingold had not provided sufficient evidence to show that that reason was a pretext for unlawful discrimination. The district court reasoned that regardless of why Feingold entered the "Not Guilty" verdicts on June 6, his immediate supervisors saw these decisions as a "serious dereliction" of his duty. The district court determined that the only defendants who had had a material role in Feingold's termination were Sullivan and Schulgasser and that, since Sullivan "immediately recused herself," "the decision to terminate [Feingold] was made by Judge Schulgasser, who, like [Feingold], is a white Jewish male."
 
 
 32
 The district court also rejected Feingold's claim that defendants had discriminated against him in the assignment of work. It characterized this allegation as "purely conclusory" and found that Feingold's proffered evidence indicated that his relatively heavy workload was the result of the tardiness of the other judges and the consequent reassignment of cases to less senior ALJs rather than of discrimination. Similarly, the court rejected Feingold's claim that he was subjected to a hostile work environment on account of race, religion, and sexual orientation. It concluded that the fact that "[his] African-American colleagues did not like him or even chose to ignore him in social contexts" was not sufficient to make out a claim on the basis of race; that the "sporadic and indirect slurs on homosexuality" were not sufficiently severe or pervasive to support a hostile work environment claim; and that there was no competent evidence that the alleged anti-Semitic remarks unreasonably interfered with Feingold's work. In addition, the district court rejected Feingold's claim of retaliation. The court concluded that the plaintiff failed to offer evidence to rebut Schulgasser's showing that Feingold's misconduct underlay Schulgasser's decision to terminate him. Further, the court found that Sullivan was unaware of Feingold's complaint until June 7, 2000, at which point she immediately recused herself from the termination decisionmaking process. Finally, the district court granted summary judgment to defendants "as to all of the remaining claims" and dismissed the case with prejudice.
 
 
 33
 Feingold now appeals, claiming that the district court erred in granting summary judgment to defendants.
 
 II. DISCUSSION
 
 34
 This court reviews grants of summary judgment de novo. Scaria v. Rubin, 117 F.3d 652, 653 (2d Cir.1997) (per curiam). Summary judgment is only warranted upon a showing "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The burden is on the moving party to establish the absence of any material factual issues. Celotex Corp. v. Catrett, 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). In determining whether there are genuine issues of material fact, we are "required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought." Stern v. Trustees of Columbia Univ., 131 F.3d 305, 312 (2d Cir.1997). We may only affirm if "it appears beyond doubt that the plaintiff can prove no set of facts in support of [his] claim which would entitle [him] to relief." Legnani v. Alitalia Linee Aeree Italiane, S.P.A., 274 F.3d 683, 685 (2d Cir.2001) (per curiam) (internal formatting omitted). Although "[i]t is now beyond cavil that summary judgment may be appropriate even in the fact-intensive context of discrimination cases," Abdu-Brisson v. Delta Air Lines, Inc., 239 F.3d 456, 466 (2d Cir.2001), "[i]n discrimination cases where state of mind is at issue, we affirm a grant of summary judgment in favor of an employer sparingly because `careful scrutiny of the factual allegations may reveal circumstantial evidence to support the required inference of discrimination.'" Mandell v. County of Suffolk, 316 F.3d 368, 377 (2d Cir.2003) (quoting Graham v. Long Island R.R., 230 F.3d 34, 38 (2d Cir.2000)).
 
 A. Claims Against the DMV
 
 35
 Feingold seeks injunctive relief from the DMV under Title VII and Section 1983, and both injunctive and monetary relief from the DMV under the NYCHRL. As a preliminary matter, we find that his Section 1983 claim is clearly barred by the Eleventh Amendment because the DMV is a state agency. See Quern v. Jordan, 440 U.S. 332, 99 S.Ct. 1139, 59 L.Ed.2d 358 (1979) (holding that Section 1983 claims against states are not permitted absent the state's consent); Pennhurst State Sch. & Hosp. v. Halderman, 465 U.S. 89, 100, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984) (stating that a suit against a state agency or department constitutes a suit against a state for Eleventh Amendment purposes). We therefore affirm the district court's grant of summary judgment to the DMV on Feingold's Section 1983 claim.
 
 
 36
 Similarly, we find that the claim against the DMV brought pursuant to the NYCHRL is also barred by state sovereign immunity. The City of New York does not have the power to abrogate the immunity of the State, and we have found no evidence that the State has consented to suit in federal court under the NYCHRL. See Campbell v. City Univ. Constr. Fund, 1999 WL 435132, at *1-*2 (S.D.N.Y.1999) (holding that the NYCHRL does not waive state sovereign immunity).
 
 
 37
 Accordingly, we now turn to Feingold's claims under Title VII.
 
 
 38
 1. Disparate Treatment Claims Against the DMV
 
 
 39
 A plaintiff may establish a claim of disparate treatment under Title VII either (1) by showing that he has suffered an adverse job action under circumstances giving rise to an inference of discrimination on the basis of race, color, religion, sex, or national origin, or (2) by demonstrating that harassment on one or more of these bases amounted to a hostile work environment. See Raniola v. Bratton, 243 F.3d 610, 617 (2d Cir.2001). We will first consider Feingold's hostile work environment claim before turning to his contention that he was given a heavier workload, and eventually terminated, on the basis of his race and religion.
 
 
 40
 a. Hostile Work Environment Claim Against the DMV
 
 
 41
 In order to prevail on a hostile work environment claim, a plaintiff must first show that "the harassment was `sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment....'" Alfano v. Costello, 294 F.3d 365, 373 (2d Cir.2002) (citations omitted); see also Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 78, 118 S.Ct. 998, 140 L.Ed.2d 201 (1998) (stating that a hostile work environment is created "[w]hen the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment"). Second, the plaintiff must demonstrate a specific basis for imputing the conduct creating the hostile work environment to the employer. Alfano, 294 F.3d at 373. We consider each requirement in turn.
 
 
 42
 (i) Evidence of a Hostile Work Environment
 
 
 43
 Proving the existence of a hostile work environment involves showing both "objective and subjective elements: the misconduct shown must be `severe or pervasive enough to create an objectively hostile or abusive work environment,' and the victim must also subjectively perceive that environment to be abusive." Id. at 374 (quoting Harris v. Forklift Sys., Inc., 510 U.S. 17, 21, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993)). Among the factors we consider are "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with [the] employee's work performance." Harris, 510 U.S. at 23, 114 S.Ct. 367. "As a general rule, incidents must be more than `episodic; they must be sufficiently continuous and concerted in order to be deemed pervasive.'" Alfano, 294 F.3d at 374 (quoting Perry v. Ethan Allen, Inc., 115 F.3d 143, 149 (2d Cir.1997)). However, a single act can create a hostile work environment if it in fact "work[s] a transformation of the plaintiff's workplace." Id.
 
 As we recently explained:
 
 44
 While the standard for establishing a hostile work environment is high, we have repeatedly cautioned against setting the bar too high, noting that "[w]hile a mild, isolated incident does not make a work environment hostile, the test is whether `the harassment is of such quality or quantity that a reasonable employee would find the conditions of her employment altered for the worse.'" (alteration and emphasis in the original).
 
 
 45
 Terry v. Ashcroft, 336 F.3d 128, 148 (2d Cir.2003) (quoting Whidbee v. Garzarelli Food Specialties, Inc., 223 F.3d 62, 70 (2d Cir.2000)). "The environment need not be `unendurable' or `intolerable.'" Id. In brief, "the fact that the law requires harassment to be severe or pervasive before it can be actionable does not mean that employers are free from liability in all but the most egregious cases." Id. (quoting Whidbee, 223 F.3d at 70 (internal quotation marks omitted)). We find that Feingold has offered sufficient evidence to permit a fact-finder to conclude that he suffered from a hostile work environment predicated on religious animosity, and that such hostility may have been exacerbated by race-based animus.
 
 
 46
 Feingold has offered proof sufficient to allow a fact-finder to conclude that he experienced pervasive discriminatory intimidation, ridicule, and insult because he was Jewish. Feingold alleges that anti-Semitic remarks (such as the mocking of his name using other "Jewish-sounding" names, and comments about Jewish lawyers) were routine,[9] and that Feingold was singled out by Lee-Sang on an "almost daily" basis on account of his religion. Feingold has produced evidence that is enough to support a finding that these remarks were not merely the result of religious consciousness, but rather stemmed from anti-Semitic hostility. Several ALJs allegedly made comments demonstrating overt animosity (e.g., Lee-Sang asking "What's wrong with these [Jewish] people?" and Waltrous speaking of "Jewish pig food"). Moreover, Feingold contends that defendant Schulgasser admitted to Feingold that he had been aware of anti-Semitism in the office for years.
 
 
 47
 Feingold's evidence is also sufficient to permit the conclusion that a reasonable employee in his position would have experienced the conditions of his employment as altered for the worse. Feingold alleges that his colleagues' hostility prevented him from receiving proper training. As both parties agree, since no formal instruction was provided to new ALJs, such ALJs relied on more experienced ALJs to provide peer training. Feingold claims that although he did undergo one or two days of observation by senior ALJs, Waltrous, who was assigned to train him, was "hostile" and "belligerent" and "snapped at him, `I ain't nobody's teacher," when he requested assistance. He further contends that he received no feedback or guidance from the other permanent ALJs. By contrast, he asserts that Pauline Haynes, an African-American, heterosexual, Christian ALJ, who was hired in May 2000, received extensive training and mentoring from all three permanent ALJs and was given a longer period of time to prepare before hearing cases. Of course, Feingold's colleagues may have decided not to train him not because of religion-based animus, but rather because they disliked Feingold as an individual, or because of some other motivation not prohibited by anti-discrimination law. Similarly, they may have given Haynes especially good training because they liked her as an individual, irrespective of her racial and religious background. These are the types of factual questions, however, that must be resolved by a jury, rather than by a court at summary judgment.
 
 
 48
 In addition, on the evidence Feingold presented, a rational fact-finder could conclude that Feingold subjectively experienced a hostile work environment. Feingold declares in his affidavit that the hostile treatment took a psychological toll on him, causing him to become depressed, to dread going to work, to seek a transfer, and to lose his desire to socialize with people in general.[10]
 
 
 49
 Feingold's evidence of a religion-based hostile work environment is enough to state a prima facie case of disparate treatment. And, while Feingold has not alleged sufficient facts to make out a hostile work environment claim based solely on race, his allegations of racial animosity can nevertheless be considered by a trier-of-fact when evaluating Feingold's religion-based claim. See Cruz v. Coach Stores, Inc., 202 F.3d 560, 572 (2d Cir.2000) (stating that one type of hostility can exacerbate the effect of another, and that such aggravating harm is legally cognizable). For purposes of supporting his hostile environment claims under the NYSHRL and the NYCHRL, Feingold may also use the evidence of harassment based on his sexual orientation, since the state and city laws prohibit discrimination on that basis. Cf. id.
 
 
 50
 (ii) Evidence to Impute Liability to the DMV
 
 
 51
 Even if a trier-of-fact were to conclude that Feingold experienced a hostile work environment, the DMV would not be liable unless "a specific basis exist[ed] for imputing the objectionable conduct" to the DMV. Alfano, 294 F.3d at 373. "When harassment is perpetrated by the plaintiff's coworkers, an employer will be liable if the plaintiff demonstrates that `the employer either provided no reasonable avenue for complaint or knew of the harassment but did nothing about it.'" Perry, 115 F.3d at 149 (quoting Karibian v. Columbia Univ., 14 F.3d 773, 780 (2d Cir.1994)). Here, Feingold has provided evidence that both his immediate supervisor and the supervisor for the entire TVB were aware that he was experiencing a hostile work environment, yet neither took any action either to disapprove of or to remedy the situation. Accordingly, Feingold has alleged sufficient facts to permit a trier-of-fact to find a specific basis for imputing the discriminatory conduct to the DMV.
 
 
 52
 b. Discriminatory Workload and Discharge Claims
 
 
 53
 Feingold may also establish a prima facie case of Title VII disparate treatment by showing 1) that he belonged to a protected class; 2) that he was qualified for the position he held; 3) that he suffered an adverse employment action; and 4) that the adverse employment action occurred under circumstances giving rise to an inference of discriminatory intent. See Collins v. New York City Transit Auth., 305 F.3d 113, 118 (2d Cir.2002). An "adverse employment action" is one which is" `more disruptive than a mere inconvenience or an alteration of job responsibilities.'" Galabya v. New York City Bd. of Educ., 202 F.3d 636, 640 (2d Cir.2000) (quoting Crady v. Liberty Nat'l Bank & Trust Co. of Ind., 993 F.2d 132, 136 (7th Cir.1993)). Examples of materially adverse employment actions include "`termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices ... unique to a particular situation.'" Id. (quoting Crady, 993 F.2d at 136).
 
 
 54
 Once a plaintiff has made out a prima facie case, the employer is required to offer a legitimate, nondiscriminatory business rationale for its conduct. See McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). If the defendant has stated a neutral reason for the adverse action, "to defeat summary judgment ... the plaintiff's admissible evidence must show circumstances that would be sufficient to permit a rational finder of fact to infer that the defendant's employment decision was more likely than not based in whole or in part on discrimination." Stern, 131 F.3d at 312.
 
 
 55
 (i) Prima Facie Case
 
 
 56
 Feingold clearly has established the first three elements of a prima facie case for disparate treatment in violation of Title VII. First, he is a member of a protected category, having alleged discrimination on the basis of race and religion. Second, Feingold undisputedly was qualified for the ALJ position, as he had in fact been hired for that position. Third, Feingold's allegations, if true, would show that he experienced two adverse employment actions: the assignment of a disproportionately heavy workload, and termination.
 
 
 57
 Feingold has also shown that he was subjected to an excessive workload and eventually terminated under circumstances giving rise to an inference of discrimination. Viewing the facts in the light most favorable to Feingold, a reasonable trier-of-fact could infer that Feingold and his white colleague, Sica, were assigned a heavier docket of cases as a result of discriminatory intent. Feingold swore under penalty of perjury that, in Sullivan's absence, Waltrous served as "Acting Senior Judge," and that in that capacity she regularly reassigned cases to the white ALJs that had originally been allocated to the three African-American ALJs. Feingold also attested that Isaacs, who was officially responsible for adjusting assignments, regularly reshuffled them to give white ALJs more work than their African-American counterparts. If a trier-of-fact credited these allegations, it could conclude that Feingold was subjected to disparate treatment under circumstances giving rise to an inference of racial discrimination.
 
 
 58
 The circumstances surrounding Feingold's discharge are also sufficient to support an inference that he was terminated on the basis of his religion and/or race. First, Feingold has presented enough evidence to support the conclusion that, even assuming the impropriety of Feingold's two not-guilty adjudications, ALJs who were not white and Jewish would not have been fired for such decisions, and indeed, were not penalized when they behaved similarly.[11] Specifically, Feingold asserts that Lee-Sang once dismissed an entire calendar of cases because the prosecuting police officer left the hearing room without her permission, and that on another occasion, Tapia dismissed the remainder of his calendar for the day because he was tired. Feingold alleges that neither ALJ was disciplined for these actions.
 
 
 59
 Defendants argue that even if Feingold's allegations are true, the failure to discipline other ALJs who adjudicated cases improperly does not support an inference of discrimination. Defendants contend that those ALJs were permanent employees, whereas Feingold was merely a probationary employee; therefore Feingold was not "similarly situated" to Lee-Sang and Tapia.[12] We disagree. It is true that, as a probationary ALJ, Feingold was not similarly situated to the other ALJs with respect to the conditions under which he could be terminated, and thus the mere fact that he was fired for his adjudications, while they were not, would not by itself support an inference of discrimination. However, evidence that African-American ALJs were not disciplined at all for their allegedly erroneous adjudications — and, indeed, that in at least one case such an adjudication was actually condoned by Sullivan — does support the conclusion that a discriminatory motive underlay Feingold's dismissal.
 
 
 60
 Defendants also argue that the other ALJs were not similarly situated to plaintiff because the individuals terminating Feingold believed that his two improper adjudications were followed by other inappropriate behavior, including breaking a glass door and audibly swearing in the hearing room. This conclusion, however, is disputed. Feingold argues that: 1) Sullivan never heard his alleged swearing; 2) the allegations of profanity were never relayed to the final decision-maker and therefore were not a basis for his termination; and 3) even if he swore (which he does not admit), he would have done so only out of frustration after Sullivan falsely accused him of intentionally breaking the glass door. In addition, the record includes a statement from Conklin that the glass pane incident alone would not have been sufficient to justify termination. Accordingly, we find that whether or not the non-disciplined ALJs were similarly situated is a matter of factual dispute which is best resolved by a finder-of-fact, and not on summary judgment. Cf. Mandell, 316 F.3d at 379 ("Ordinarily, the question whether two employees are similarly situated is a question of fact for the jury.").
 
 
 61
 Second, Feingold has presented sufficient evidence to permit the conclusion that the two "not guilty" adjudications for which he allegedly was fired were in fact consistent with the instructions given by his supervisors. Feingold alleges that Schulgasser directed other ALJs to dismiss cases when a police officer leaves the hearing room. This assertion is corroborated by Sullivan's deposition testimony regarding Lee-Sang's dismissal of a number of cases on an occasion when a police officer quit the room. When Sullivan asked Lee-Sang about the incident, Lee-Sang replied that she had been instructed by Schulgasser to dismiss in such situations. Sullivan stated that she had "no doubt this is the case because I heard of other cases where this transpired." Sullivan also acknowledged that dismissal is a valid response when a police officer leaves a hearing room without permission, noting that Lee-Sang's behavior had been "appropriate" under the circumstances. While the facts surrounding the allegedly improper adjudication by Lee-Sang are somewhat different from those of Feingold's June 6 adjudications,[13] a reasonable fact-finder could conclude that Feingold's failure to wait until the police officer returned before adjudicating the case could not, in itself, have been seen as improper by either Schulgasser or Sullivan. Feingold further alleges that Sullivan had instructed him not to use a "D — 5" (non-appearance) dismissal code when a police officer failed to appear, but rather to use an "N — 1" (not guilty) code to spare the officer trouble from his supervisors.[14] If this allegation is true, it would indicate that at least Sullivan did not in fact disapprove of entering an "N — 1" code where a "D — 5" code was technically accurate. For all these reasons a jury could find that Feingold's behavior in entering the two "not guilty" results was consistent with the combined instructions of Schulgasser and Sullivan, and hence that his termination was grounded in discrimination.
 
 
 62
 In holding that an inference of discrimination is possible, moreover, we reject defendants' argument that because Sullivan and Schulgasser hired Feingold, an inference must be drawn against Feingold's claim that they recommended his termination for discriminatory reasons. Even if the "same actor inference" applies to Title VII claims,[15] it would not necessarily apply here given the changes in circumstances during the course of Feingold's employment. Cf. Carlton v. Mystic Transp., Inc., 202 F.3d 129, 137-38 (2d Cir.2000) (recognizing that the same actor inference does not apply to an ADEA claim with as much force when a significant amount of time has passed between hiring and firing, presumably because the circumstances evolved as the person aged). Feingold's complaints of discrimination could be found to have altered the circumstances of his employment: Viewing the evidence in the light most favorable to the plaintiff, after complaining about discrimination Feingold became not merely a white Jew but a white Jew who (allegedly unlike Schulgasser) would not tolerate a discriminatory office culture.[16]
 
 
 63
 We also reject the district court's suggestion that an inference of discrimination cannot be drawn because Feingold was fired by another Jew (Schulgasser). The Supreme Court has "rejected any conclusive presumption" that an employer or, presumably, his agents, will not discriminate against members of their own race or gender. Oncale, 523 U.S. at 78, 118 S.Ct. 998; see also id. ("`Because of the many facets of human motivation, it would be unwise to presume as a matter of law that human beings of one definable group will not discriminate against other members of their group.'" (quoting Castaneda v. Partida, 430 U.S. 482, 499, 97 S.Ct. 1272, 51 L.Ed.2d 498 (1977)). It is no more reasonable to presume that individuals will not discriminate against practitioners of their own religious faith. Further, Schulgasser was not the ultimate decision-maker in Feingold's termination, nor was he the only supervisor to recommend that plaintiff be fired.
 
 
 64
 (ii) Defendants' Explanation for Feingold's Firing
 
 
 65
 Defendants have offered a legitimate, non-discriminatory business rationale for terminating Feingold's employment. Specifically, defendants claim that Feingold was fired because his supervisors believed he had violated DMV policy when he adjudicated two motorists "not guilty" and had behaved inappropriately when he allegedly swore audibly in the hearing room and broke a glass door. Defendants contend that plaintiff's conduct bespoke a lack of judicial disposition, justifying termination. Defendants have also provided a putatively legitimate, non-discriminatory reason for Feingold's allegedly disproportionate workload. They explain that Feingold and Sica, the white ALJs, were less senior than the African-American ALJs, and assert that Feingold's sizable workload reflected his lack of seniority, not his race.[17]
 
 
 66
 These explanations need not, however, detain us long. For, as previously indicated, we find that Feingold has presented sufficient evidence for a reasonable trier-of-fact to conclude that defendants' stated reason for Feingold's termination was pretextual. First, as earlier discussed, a reasonable jury could conclude that in adjudicating the two motorists not guilty on June 6, Feingold was acting in accordance with the combined instructions of Sullivan and Schulgasser. Second, a reasonable fact-finder could determine that, even if Feingold's supervisors disapproved of his adjudications, defendants' proffered reason for Feingold's termination was pretextual since other ALJs were not reprimanded or disciplined for similar mistakes.[18] As previously noted, a reasonable fact-finder could infer discriminatory motive by interpreting this failure to indicate that Feingold's June 6 adjudications did not truly excite the disapprobation of his supervisors.
 
 
 67
 In addition, defendants have provided no admissible evidence that new African-American ALJs (e.g., Pauline Haynes and Feingold's replacement) in the MNO also received disproportionately heavy workloads in comparison to the more senior ALJs, or that white ALJs with greater seniority would not have continued to bear greater workloads. By contrast, Feingold provides the sworn testimony of another ALJ that it is DMV policy that a probationary ALJ is not to carry a heavier load than a permanent ALJ. This evidence could permit a trier-of-fact to conclude that defendants' stated rationale for Feingold's heavy workload was pretextual, and that the workload was the result of unlawful discrimination.
 
 
 68
 In sum, the district court erred in granting summary judgment to the DMV on Feingold's disparate treatment claim.
 
 2. Retaliation Claim Against the DMV
 
 69
 Feingold also claims that he was discharged in retaliation for his complaints of unlawful discrimination. He argues that given (1) the temporal proximity between his complaints to Schulgasser and his termination, and (2) the fact that Tapia and Lee-Sang were not disciplined for conduct that arguably was more serious than Feingold's actions on June 6, he has alleged facts sufficient to establish a retaliation claim.
 
 
 70
 a. Prima Facie Case
 
 
 71
 In order to "establish a prima facie case of retaliation, an employee must show `[1] participation in a protected activity known to the defendant; [2] an employment action disadvantaging the plaintiff; and [3] a causal connection between the protected activity and the adverse employment action.'" Quinn v. Green Tree Credit Corp., 159 F.3d 759, 769 (2d Cir.1998) (quoting Tomka v. Seiler Corp., 66 F.3d 1295, 1308 (2d Cir.1995)).
 
 
 72
 Feingold has satisfied all three requirements. First, when he complained to Schulgasser of unlawful discrimination on May 24, June 7, and June 12, Feingold participated in a protected activity. Second, he suffered an adverse employment action when he was fired. Third, the requirement that Feingold show a causal connection between his complaints and his termination is satisfied by the temporal proximity between the two. See Lovejoy-Wilson v. NOCO Motor Fuel, Inc., 263 F.3d 208, 224 (2d Cir.2001) ("`The causal connection needed for proof of a retaliation claim can be established indirectly by showing that the protected activity was closely followed in time by the adverse action.'" (quoting Cifra v. Gen. Elec. Co., 252 F.3d 205, 216 (2d Cir.2001))); Quinn, 159 F.3d at 769 (finding that the causal connection requirement was satisfied simply because the plaintiff's discharge came less than two months after one complaint and just ten days after another); Manoharan v. Columbia Univ. Coll. of Physicians & Surgeons 842 F.2d 590, 593 (2d Cir.1988) ("Proof of the causal connection can be established indirectly by showing that the protected activity was closely followed in time by the adverse action.").
 
 
 73
 It is undisputed that two weeks after Feingold's first complaint to a supervisor, his supervisors agreed to recommend his termination. We reject defendants' contention that the events of June 6 constitute an intervening event that precludes drawing any inference of discrimination from temporal proximity. This argument presumes that the events of June 6 were the actual cause of Feingold's termination. But, whether or not they were is exactly what is factually in dispute in this case, and hence cannot be decided at summary judgment.
 
 
 74
 b. Defendants' Rationale
 
 
 75
 Since Feingold has stated a prima facie case of retaliation, the burden shifts to defendants to state a legitimate non-discriminatory reason for Feingold's termination. See Coffey v. Dobbs Int'l Servs., Inc., 170 F.3d 323, 326 (2d Cir.1999) (stating that burden-shifting applies to retaliation claims under Title VII). Here, as before, defendants allege that Feingold was fired due to his improper adjudication of two cases, his inappropriate use of language, and the glass pane incident, all of which showed a lack of judicial disposition. These reasons, if true, would be legitimate and non-discriminatory.
 
 
 76
 For the reasons discussed in Section II(A)(1)(b)(ii) of this opinion, we find that Feingold has produced sufficient evidence for a reasonable trier-of-fact to conclude that defendants' stated reason for his termination was a pretext for unlawful discrimination. Accordingly, the district court erred in granting summary judgment to the DMV on Feingold's retaliation claims under Title VII.
 
 B. Claims Against the Individual Defendants
 
 77
 Feingold asserts that the individual defendants are liable under the NYSHRL, the NYCHRL, and Section 1983 in their individual capacities. As a preliminary matter, we note that Feingold has presented neither any argument nor any evidence that the unnamed "other administrative law judges and employees" listed in the caption engaged in illegal conduct for which they are liable. Accordingly, we affirm the district court's decision insofar as it granted summary judgment to those unnamed defendants, and turn to the claims against the named individual defendants.
 
 1. New York State Human Rights Law Claims
 
 78
 Feingold alleges that the named individual defendants are liable in their individual capacities under the NYSHRL. The NYSHRL makes it unlawful for an employer to discriminate on the basis of, inter alia, race, creed, color, or sexual orientation. See N.Y. Exec. Law § 296. A supervisor is an "employer" for purposes of establishing liability under the NYSHRL if that supervisor "actually participates in the conduct giving rise to [the] discrimination." Tomka, 66 F.3d at 1317. In addition, the NYSHRL states that it shall be an unlawful discriminatory practice "for any person to aid, abet, incite, compel or coerce the doing of any of the acts forbidden under this article, or attempt to do so." N.Y. Exec. Law § 296(6). In Tomka, we found that this language allowed a co-worker who "actually participates in the conduct giving rise to a discrimination claim" to be held liable under the NYSHRL even though that co-worker lacked the authority to either hire or fire the plaintiff. Tomka, 66 F.3d at 1317.[19] (Like the defendants in the case at hand, the co-worker in Tomka, while above the plaintiff in the office hierarchy, merely had the ability to review and comment on the plaintiff's performance. See id.)
 
 
 79
 Here, Feingold has presented sufficient evidence to create a triable question as to whether each of the named individual defendants "actually participate[d]" in the conduct giving rise to Feingold's claim of unlawful discrimination in violation of the NYSHRL. Feingold has proffered enough evidence to permit the conclusions (a) that Lee-Sang, Tapia, and Waltrous all participated in creating a hostile work environment, (b) that Waltrous and Isaacs assigned him a disproportionate workload because of his race, and (c) that Sullivan and Schulgasser not only took no action to remedy such behavior although they were aware of it, but also terminated Feingold's employment on the basis of impermissible factors. Accordingly, the district court erred in granting summary judgment to the named individual defendants on Feingold's claims under the NYSHRL.
 
 2. New York City Human Rights Law Claims
 
 80
 Feingold also claims that the named individual defendants are liable under the NYCHRL in their individual capacities. The NYCHRL makes it unlawful "[f]or an employer or an employee or agent thereof, because of the actual or perceived ... race, creed ... [or] sexual orientation ... to refuse to hire or employ or to bar or to discharge from employment such person or to discriminate against such person in compensation or in terms, conditions or privileges of employment." N.Y.C. Admin. Code § 8-107(1)(a).
 
 
 81
 The same standards of analysis used to evaluate aiding and abetting claims under the NYSHRL apply to such claims under the NYCHRL because the language of the two laws is "virtually identical." Dunson v. Tri-Maintenance & Contractors, Inc., 171 F.Supp.2d 103, 113-114 (E.D.N.Y.2001); see also Kato v. Ishihara, 239 F.Supp.2d 359, 365 (S.D.N.Y.2002) (finding that an individual may be held liable under the NYCHRL if he or she engaged in "discriminatory acts"); Lamberson v. Six West Retail Acquisition, Inc., 122 F.Supp.2d 502, 513 (S.D.N.Y.2000) (applying the aider and abetter standard set forth in Tomka to claims under the NYSHRL and the NYCHRL); Sowemimo v. D.A.O.R. Sec., Inc., 43 F.Supp.2d 477, 490 (S.D.N.Y.1999) ("[E]mployees may be held personally liable under the [NYS]HRL and the NYCHRL" if they participate "in the conduct giving rise to a discrimination claim."). We therefore find that the claims against the named individual defendants may proceed under the NYCHRL for the same reasons that they may under the NYSHRL.
 
 
 82
 3. Section 1983 Claims Against the Individual Defendants
 
 
 83
 Finally, Feingold appeals the district court's grant of summary judgment on his Section 1983 claims against the named individual defendants in their individual capacities. "To state a claim under § 1983, a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law." West v. Atkins, 487 U.S. 42, 48, 108 S.Ct. 2250, 101 L.Ed.2d 40 (1988). Here, Feingold has shown that the deprivations he alleges were under color of state law because they were committed by state employees acting in their official capacities as MNO employees and exercising their responsibilities pursuant to state law. See id. at 49-50, 108 S.Ct. 2250; Hayut v. State Univ. of New York, 352 F.3d 733, 744 (2d Cir.2003).
 
 
 84
 a. Equal Protection Claim
 
 
 85
 Feingold alleges that each of the named individual defendants is liable in his or her individual capacity under Section 1983 for violating Feingold's constitutional right to Equal Protection.
 
 
 86
 Once action under color of state law is established, Feingold's equal protection claim parallels his Title VII claim.[20] The elements of one are generally the same as the elements of the other and the two must stand or fall together. See Annis v. County of Westchester, 136 F.3d 239, 245 (2d Cir.1998) ("In analyzing whether conduct was unlawfully discriminatory for purposes of § 1983, we borrow the burden-shifting framework of Title VII claims."); Jemmott v. Coughlin, 85 F.3d 61, 67 (2d Cir.1996) (stating that "Title VII law... is utilized by courts considering § 1983 Equal Protection claims" and recognizing that "several circuits have held that, when § 1983 is used as a parallel remedy with Title VII in a discrimination suit ... the elements of the substantive cause of action are the same under both statutes.").
 
 
 87
 A finding of "personal involvement of [the individual] defendants" in an alleged constitutional deprivation is a prerequisite to an award of damages under Section 1983. Provost v. City of Newburgh, 262 F.3d 146, 154 (2d Cir.2001) (internal quotation marks omitted). We have earlier found that Feingold has presented sufficient evidence to permit the conclusion that all of the named individual defendants were personally involved in behavior unlawful under the NYSHRL. It follows that he has also presented sufficient evidence to permit the conclusion that all of the named individual defendants were personally involved in behavior unlawful under Title VII. See Mandell, 316 F.3d at 377. He has also, therefore, presented sufficient evidence to permit the conclusion that they were personally involved in behavior that violates Section 1983. See Annis, 136 F.3d at 245. Accordingly, we reverse the grant of summary judgment to the named individual defendants as to the plaintiff's equal protection claim.
 
 
 88
 b. First Amendment Claim
 
 
 89
 Feingold alleges that Sullivan and Schulgasser violated his First Amendment rights by terminating him for complaining about discrimination in the MNO. A public employee claiming First Amendment retaliation must demonstrate that: "(1) his speech addressed a matter of public concern, (2) he suffered an adverse employment action, and (3) a causal connection existed between the speech and the adverse employment action, `so that it can be said that his speech was a motivating factor in the determination.'" Mandell, 316 F.3d at 382.[21] Feingold has satisfied the second requirement because his termination constituted an adverse employment action. He has satisfied the third requirement because, as discussed earlier, he provided sufficient evidence to enable a reasonable trier-of-fact to conclude that his complaints of unlawful discrimination were a motivating factor in his termination. The only question that therefore remains is whether Feingold was speaking on a matter of public concern.
 
 
 90
 The defendants contend that Feingold was not speaking on a matter of public concern because he spoke to matters that were personal in nature and related to his own situation. Feingold counters that he was also speaking about a matter of public concern because he reported wide-spread racism and anti-Semitism, inadequate training, and unjustified judicial delay in the MNO. He contends that these problems compromised the fairness of the MNO's hearings. While Feingold's alleged complaints were based on his personal experience, they also suggest that the fairness and impartiality of the MNO may have been compromised, and that the MNO suffered from delay due to the failure of other ALJs to work full days. These issues are clearly matters of public concern. Cf. id. at 382 (speech regarding, inter alia, a police department's anti-Semitism is speech on a matter of public concern). Accordingly, Feingold may proceed on his First Amendment claim against Sullivan and Schulgasser.
 
 C. Claims Against the State of New York
 
 91
 On appeal, Feingold never mentions that he maintains claims against the State, nor does he provide any argument as to why the State should be held liable. We therefore find that Feingold has waived his remaining claims against the State. See Norton v. Sam's Club, 145 F.3d 114, 117 (2d Cir.1998) ("Issues not sufficiently argued in the briefs are considered waived and normally will not be addressed on appeal."); LNC Invs., Inc. v. Nat'l Westminster Bank, 308 F.3d 169, 176 n. 8 (2d Cir.2002) ("While we no doubt have the power to address an argument despite its abandonment on appeal, we ordinarily will not do so `unless manifest injustice otherwise would result.'" (quoting Anderson v. Branen, 27 F.3d 29, 30 (2d Cir.1994))).
 
 III. CONCLUSION
 
 92
 For the reasons stated above, we VACATE and REMAND the district court's grant of summary judgment to the DMV on Feingold's Title VII claims of disparate treatment, retaliation, and a hostile work environment based on religious animus. We AFFIRM the district court's grant of summary judgment to the DMV on Feingold's Section 1983 claim and on his NYCHRL claim. We VACATE and REMAND the district court's grant of summary judgment to the named individual defendants on Feingold's Section 1983, NYSHRL, and NYCHRL claims. Finally, we AFFIRM the district court's grant of summary judgment to the State and to the unnamed ALJs and employees on all claims against them. Pursuant to Federal Rule of Appellate Procedure 39(a)(4), costs of this appeal are awarded to the plaintiff.
 
 
 
 Notes:
 
 
 [1]
 The Honorable Fred I. Parker, who was a member of this panel, passed away on August 12, 2003. Prior to his death, Judge Parker's chambers completed a substantial portion of the work on this case. Under the circumstances, and in his memory, we issue this opinion in his name
 
 
 [2]
 We note that the district court's summary of Feingold's claims did not list either the Section 1983 claim for injunctive relief against the DMV or those of Feingold's claims against the State which he did not agree to withdraw with prejudice. However, a review of Feingold's complaint, his stipulated agreement to dismiss portions of that complaint, and the transcript of the district court proceeding convince us that these claims were still part of Feingold's case at the time the district court rendered its decision
 
 
 [3]
 Feingold's briefs on appeal also state that the district court ruled on his claim against the DMV under the NYSHRL. However, in a stipulation dated August 20, 2001, Feingold agreed to withdraw that claim with prejudice and therefore it is not before us
 
 
 [4]
 Neither Sica's religious affiliation nor Schulgasser's sexual orientation are reflected in the record on appeal
 
 
 [5]
 According to plaintiff, Lee-Sang remarked that she "did not know what's wrong with these people" that they would hold a conference on a Sunday, when Christians attended church services
 
 
 [6]
 The parties dispute whether or not Feingold was aware of the reason for the officer's absence
 
 
 [7]
 Accordingly, the district court erred in its statement that "it is beyond genuine dispute that the decision to terminate [Feingold] was made by Judge Schulgasser...." Defendants admit that the person who recommended termination to the ultimate decision-maker was Ferrara, and that her recommendation was based both on Schulgasser and Sullivan's recommendations
 
 
 [8]
 The phrase "named individual defendants" refers to Schulgasser, Sullivan, Waltrous, Lee-Sang, Tapia and Isaacs, as distinguished from "other administrative law judges and employees" listed in the caption of this opinion
 
 
 [9]
 Compare Shabat v. Blue Cross Blue Shield of Rochester Area, 925 F.Supp. 977 (W.D.N.Y.1996) (granting summary judgment on a claim of an anti-Semitic hostile work environment where the alleged anti-Semitic comments — although arguably more vicious than those at issue in the case at hand — were isolated comments made infrequently over a period of five years).
 
 
 [10]
 Defendants argue that Feingold did not in fact perceive the work environment as hostile because he stayed at the MNO rather than accepting a transfer to the Coney Island office that was offered to him. However, Feingold responds that such a transfer would have doubled or tripled his daily commute, that Schulgasser had told Feingold he could get him transferred out of the MNO (apparently indicating that another transfer was possible), that he was suspicious of the offer because it was his understanding that it was DMV policy not to transfer probationary employees, and that this offer was made relatively early in his appointment and therefore he still held out some hope that he could "conquer the biases of his colleagues and excel in his work" at the MNO. Accordingly, Feingold's failure to accept the Coney Island transfer does not compel the conclusion that Feingold failed to perceive the MNO environment to be hostile
 
 
 [11]
 We note that the conclusion that Feingold was fired on the basis of religion or race could also find support in the circumstantial evidence offered by Feingold that white and Jewish ALJs who began work at the MNO readily transferred or were terminated. For example, ALJ Robert Re observed in his affidavit that "[i]n the last several years, almost every Caucasian ALJ who has worked in the MNO has transferred out of that office, or has been terminated before their probation was over."
 
 
 [12]
 During the first year of his or her employment with the DMV, an ALJ is considered to be a "probationary ALJ."
 
 
 [13]
 There is some evidence in the record to suggest that Sullivan believed that dismissal, rather than a "not-guilty" adjudication, was the appropriate resolution in cases where a police officer left the room
 
 
 [14]
 Consistent with this explanation, the "purported transcript" of the hearing shows that when Feingold instructed the clerk in the hearing room to enter the "N — 6" designation, Feingold also stated "N-one. I won't get him in trouble."
 
 
 [15]
 We do not pass judgment on the extent to which this inference is either required or appropriate outside the Age Discrimination in Employment Act (ADEA) context in which it generally is applied
 
 
 [16]
 Technically speaking, Sullivan and Schulgasser did not hire Feingold, as he was appointed by the then-Commissioner of Motor Vehicles
 
 
 [17]
 To support this rationale, they offer the inadmissible hearsay testimony of an MNO clerk that ALJ Haynes also complained of a disproportionate workload when she began work at the MNO. In reviewing the district court's grant of summary judgment, however, we may only consider admissible testimonySee Raskin v. Wyatt Co., 125 F.3d 55, 65-66 (2d Cir.1997).
 
 
 [18]
 In contrast, Feingold's argument that a reasonable fact-finder could conclude that the rationale was pretextual because the manner in which he was fired did not accord with normal DMV practice is without support. Feingold does not provide any meaningful evidence of the "general policy" he alleges
 
 
 [19]
 Though state courts are not in unanimous agreement with this aspect of our decision inTomka, the majority of courts that have considered the issue have affirmed the existence of a cause of action against individual defendants under the aid-or-abet provision of the NYSHRL. See, e.g., D'Amico v. Commodities Exch., Inc., 235 A.D.2d 313, 652 N.Y.S.2d 294 (N.Y.App.Div.1997) (calling the availability of this cause of action "settled precedent in [the First] Department"); Murphy v. ERA United, 251 A.D.2d 469, 674 N.Y.S.2d 415 (N.Y.App.Div.1998) (clarifying, after an earlier decision cast doubt on plaintiffs' ability to sue co-workers under the aid-and-abet provision, that co-employees may be held liable for aiding and abetting the discrimination of an employer so long as the employer itself is susceptible to suit). See also Heinemann v. Howe & Rusling, 260 F.Supp.2d 592, 596-97 (W.D.N.Y.2003) (discussing the status of Tomka); Petrosky v. New York State Dep't of Motor Vehicles, 72 F.Supp.2d 39, 65 (N.D.N.Y.1999) (noting that the "vast majority of federal courts to have considered the question have followed Tomka").
 
 
 [20]
 Except, of course, that unlike a Title VII claim a Section 1983 claim can be brought against individuals
 
 
 [21]
 Once this three-pronged test is satisfied, the extent to which Feingold could be disciplined for his speech is "determined by balancing the interest of the employee, in his role as a citizen, in commenting on matters of public concern against the interest of the government, in its role as an employer, in promoting the efficiency of the services it performs through its employees."Mandell, 316 F.3d at 382. As Feingold's complaints were entirely internal, made directly to a person in a supervisory position, and defendants never suggest that they were in any way disruptive, Feingold's interest in his speech clearly outweighs any hypothetical interest of the DMV in preventing that speech.