**Sergey SOLOGUB, Plaintiff–Appellant,**

v.

**THE CITY OF NEW YORK,**
**Defendant–Appellee.**

**Docket No. 99–7306.**

United States Court of Appeals,
Second Circuit.

Argued Oct. 20, 1999.

Decided Jan. 21, 2000.

Paul C. Matthews, New York, NY, for Plaintiff–Appellant,

Edward F.X. Hart, Office of Corporation Counsel of the City of New York, New York, N.Y. (Michael D. Hess, Corporation Counsel of the City of New York, Leonard Koerner, of Counsel, on the brief), for Defendant–Appellee.

Before: KEARSE, MINER and LEVAL, Circuit Judges.

MINER, Circuit Judge:

Plaintiff–Appellant Sergey Sologub appeals from a summary judgment entered in favor of defendant-appellee The City of New York ("the City") in the United States District Court for the Southern District of New York (Martin, *J.*). Sologub was employed by the City in the civil service title of deckhand. He was as-

signed to Staten Island Ferry Terminal duties when he was seriously injured in the course of his employment while assisting in the docking of a ferry. Sologub brought the action giving rise to this appeal to recover damages for the injuries he sustained as a result of the accident. In his complaint Sologub claimed the benefits of the Jones Act, 46 U.S.C. App. § 688(a), which allows seamen to recover damages against their employers for personal injuries suffered in the course of their employment. The City moved for summary judgment, and the district court granted the motion after concluding that Sologub was not a seaman for the purposes of Jones Act coverage at the time he was injured. *See Sologub v. City of New York*, No. 96–5234, 1999 WL 76865, *1–2 (S.D.N.Y. Feb.16, 1999).

## BACKGROUND

Born in Russia on July 19, 1969, Sologub has been engaged in maritime studies or the performance of maritime-related employment since the age of fourteen. At that age, he enrolled in the Naval Junior Marine School in Sevastopol, U.S.S.R. He then completed four years of study at the Odessa Marine & Engineering College and thereafter worked in an unlicensed capacity for the Black Sea Shipping Company on various ferry transports and cruise ships. Following that service, he enrolled at a Marine & Engineering Academy and completed an Engineer–Navigator course. In November 1991, Sologub was issued licenses by the Republic of Liberia, qualifying him to sail as a Third Officer and Third Assistant Engineer on ships of Liberian registry.

In 1992, Sologub started to sail on American ships and joined the Seafarer's International Union in 1993. As a union member, he attended a course given by the Harry Lundeberg School of Seamanship. At the conclusion of that course, he took and passed an examination given by the United States Coast Guard and was certified as an able seaman. Sologub then worked as a deckhand for McAllister Brothers Corp. and Morania Oil Tanker Corp. He completed a course in navigational safety training in 1994. Having applied for the position in 1993, Sologub was hired in the civil service title of deckhand in June of 1995 by the Department of Transportation of the City of New York, Division of Ferries.

Through the Division of Ferries, the City operates a fleet of seven ferryboats for the transportation of passengers and vehicles between the terminals at Whitehall Street in lower Manhattan and St. George in Staten Island. Five of the seven boats are operated during any given week. Eighty-five deckhands usually are working during any 24–hour period. Of these, fifty-eight are assigned to perform duties while riding on the boats and twenty-seven are assigned to work at the terminals, handling lines and gates and mechanical devices that facilitate the boarding and discharge of passengers and vehicles. The City requires that all deckhands be familiar with the duties to be performed aboard the vessels, as well as the duties to be performed in the terminals. To qualify for the civil service position of deckhand, an applicant must have two years of satisfactory service as a deckhand within the last ten years, with preference given to those with experience on ferry boats.

Approximately 196 deckhands are employed by the Division of Ferries, 70% of whom generally work on the boats and 30% at the terminals providing shoreside support. All the deckhand jobs are subject to bidding and are assigned by seniority. Bidding preferences may designate a specific shift, a specific boat, terminal duty or boat duty. According to Joseph Lynch, the shop steward of the union that represents the deckhands, those who seek to work on a boat "will usually succeed in obtaining a berth aboard a ferry by not being selective, but instead showing a willingness to work any shift on any boat." One of those who was so willing was Sergey Sologub.

Sologub indicated on his bid slip that he was willing to take any slot on any boat. Ambitious for advancement, he told Captain Ryan, the Head of the Division of Ferries, that it was his "dream" to advance to mate, assistant captain, or captain on one of the ferry boats. During any 24–hour period, fourteen mates, nine assistant captains and nine captains customarily are on duty. Despite his desire to serve exclusively on the boats and his forward movement on the seniority list, Sologub worked intermittently on various boats between the commencement of his employment on June 30, 1995 and September 22, 1995. During that period, he apparently worked alternately at the terminals and on the boats, with no fixed schedule.

Commencing on September 26, 1995 and continuing to the date of his accident on the night of April 15, 1996, Sologub was regularly assigned to terminal duties. These duties consisted of work either as a bridgeman or an apronman. From a dockside work station, a bridgeman raises and lowers the pedestrian walkway or "bridge" that connects the dock to the second deck of the ferry to allow passengers to board and exit. He also is assigned to open and close the terminal doors to allow passengers to pass from the terminal to the ferry. From a position on shore, an apronman raises and lowers the movable ramps called "aprons" that allow passengers to board and exit the main deck of the ferryboat. He also is assigned to open the terminal gates. Bridgemen and apronmen perform assigned cleaning duties at the terminal as well.

Sologub worked at the Whitehall Terminal from September 26, 1995 to February 22, 1996 as a bridgeman or apronman. Only one eight-hour tour of duty during that entire period was served aboard a ferry. Commencing on February 22, 1996, he was assigned to what he referred to as a "steady position," replacing another worker who had been reassigned. In this new position, Sologub worked as a night-shift bridgeman/apronman, alternating be-

tween the terminals at St. George and Whitehall. His regular work week was four days on and three days off, and he worked two consecutive nights in each terminal. Late on the night of April 15 or in the early morning hours of April 16, 1996, at the St. George Terminal, Sologub sustained the injuries giving rise to his Jones Act claim. The accident occurred when Sologub stood on top of pilings to receive mooring lines from a deckhand aboard a ferry that was laying up for the night. The tide was low, and Sologub was far above the deck of the boat. Apparently, there was no illumination of the area where Sologub was standing and the weather was overcast and drizzling. As the boat came in, it struck the side of the slip and jarred the pilings upon which Sologub was standing. He lost his balance and fell between the pilings, where he was found unconscious sometime later.

In granting summary judgment on the determination that Sologub was not a seaman within the intendment of the Jones Act at the time he was injured, the district court acknowledged that the question of seaman status is often not an appropriate one to take away from the jury. However, the court concluded that the uncontested facts demonstrated that Sologub did not hold the status of seaman when he sustained his injuries. The district court reasoned that, since Sologub was assigned as a terminal-based deckhand at the St. George Terminal and therefore did not work at sea, he could not be classified as a seaman. The court observed that "his connection to the ferries was transitory in that he only worked with the ferries at the beginning and end of their voyages." *Sologub*, 1999 WL 76865 at *1. Contending on appeal that the issue of his seaman status should have been submitted to a jury, Sologub argues that the district court erred in failing to consider the existence of relevant evidence indicating a connection to the fleet of ferryboats that was substantial in both duration and nature. Sologub also faults the district court's application of Su-

preme Court precedent in granting summary judgment. Finding no basis for the positions advanced by Sologub, we affirm.

## DISCUSSION

 Essential to success on a motion for summary judgment is a showing by the moving party that there are no genuine issues of material fact *and* that it is entitled to judgment as a matter of law. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); Fed.R.Civ.P. 56(c). The district court "must view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in its favor." *Consarc Corp. v. Marine Midland Bank, N.A.,* 996 F.2d 568, 572 (2d Cir. 1993). We review *de novo* a determination by the district court to grant summary judgment. *See Stagl v. Delta Airlines, Inc.,* 52 F.3d 463, 466–67 (2d Cir.1995). When reasonable persons, applying the proper legal standards, could differ in their responses to the question of seaman status raised in a Jones Act case on the basis of the evidence presented, the question is one for a jury, *see McDermott Int'l, Inc. v. Wilander,* 498 U.S. 337, 356, 111 S.Ct. 807, 112 L.Ed.2d 866 (1991), and summary judgment therefore would be inappropriate.

The evidentiary materials presented by the parties in this case—Sologub's educational and work history, his employment by the City in the deckhand classification, his actual work assignments by the Division of Ferries, his aspirations for advancement and the manner of the occurrence of the accident giving rise to his injuries—are not in substantial dispute. Nevertheless, the application of the proper legal standards to the facts presented reasonably supports only one conclusion here—that Sologub does not have the status necessary to maintain this action.

The Jones Act provides that "[a]ny seaman who shall suffer personal injury in the course of his employment may, at his election, maintain an action for damages at law, with the right of trial by jury." 46 U.S.C. App. § 688(a). Although the Act confers a cause of action in negligence, it provides no definition of the term "seaman." Accordingly, since the enactment of the Legislation in 1920, courts have wrestled with the problem of determining which maritime workers are entitled to Jones Act protection. Congress provided some assistance with the definition by legislating in the negative with the enactment of the Longshore and Harbor Workers' Compensation Act (LHWCA), 44 Stat. (part 2) 1424, as amended, 33 U.S.C. § 901 *et seq.,* in 1927. The LHWCA provides scheduled compensation benefits as an exclusive remedy for injuries to land-based maritime workers of various types and specifically *excepts* "a master or member of a crew of any vessel." 33 U.S.C. § 902(3)(G). The Supreme Court has noted that the maritime workers excepted in the LHWCA are those who are covered under the Jones Act. *See Wilander,* 498 U.S. at 347, 111 S.Ct. 807.

The plaintiff in *Wilander* was a foreman on a paint boat chartered by McDermott International. His assignment was to supervise the sand-blasting and painting of various components of oil-drilling platforms in the Persian Gulf. Injured in the course of his employment, he brought an action under the Jones Act, and succeeded in obtaining a jury award. The judgment entered in his favor was affirmed by the Court of Appeals. *See* 887 F.2d 88 (5th Cir.1989). McDermott's contention that seaman status was lacking was rejected by the Supreme Court. The Court considered whether the term "seaman" should be restricted to those maritime workers who aid in the navigation of a vessel and rejected the restriction. Acknowledging that its prior decisions in this area may have engendered confusion, in that the aid in navigation requirement was reiterated even in cases affording seaman status to those who had no connection to navigation, the Court in *Wilander* abandoned this requirement

altogether. *See Wilander,* 498 U.S. at 348–53, 111 S.Ct. 807.

Although the Supreme Court determined that "[i]t is not necessary that a seaman aid in navigation or contribute to the transportation of the vessel," it did hold that "a seaman must be doing the ship's work." *Id.* at 355, 111 S.Ct. 807. The Court in *Wilander* established a rule "defin[ing] 'master or member of a crew' under the LHWCA, and therefore 'seaman' under the Jones Act, solely in terms of the employee's connection to a vessel in navigation." *Id.* at 354, 111 S.Ct. 807. "The key to seaman status," wrote the Court, "is employment-related connection to a vessel in navigation." *Id.* at 355, 111 S.Ct. 807. After *Wilander,* the Court soon came to realize that the key it had fashioned did not serve to unlock the confusion-encrusted definition of "seaman." What indeed was an "employment-related connection"?

The Supreme Court took another run at defining "seaman" for Jones Act purposes in *Chandris, Inc. v. Latsis,* 515 U.S. 347, 115 S.Ct. 2172, 132 L.Ed.2d 314 (1995). In this, its most definitive pronouncement on the subject, the Court was confronted with the case of a superintendent engineer employed by Chandris, Inc. The engineer, Latsis, was responsible for the maintenance of electronic and communication equipment on the six passenger cruise ships that made up Chandris' fleet of vessels. Each ship carried a permanent complement of 12–14 engineers. Latsis was one of two supervising engineers, and his duties required him to spend time at sea overseeing the engineering departments aboard the vessels and on shore directing maintenance activities from Chandris' Miami office. The proportion of time spent ashore and at sea was a matter in dispute.

Latsis apparently sustained his injury while sailing aboard a vessel that was to be renovated. His duties were to plan for the renovation, but he developed a problem in his right eye on the date of departure. The problem turned out to be a detached retina, a condition suspected by the ship's doctor. The doctor advised Latsis to wait to see an eye specialist in Bermuda, where the ship was to arrive two days later. It appears that standard medical practice would have required Latsis to be treated by an ophthalmologist on an emergency basis, which would have called for Latsis to be evacuated from the ship before it reached the open sea. Surgery was performed on arrival in Bermuda, but Latsis lost seventy-five percent vision in his right eye. After a six-week recuperation, Latsis sailed with the same ship to Bremerhaven, Germany, where the vessel was in drydock for six months for renovation. Latsis remained in Bremerhaven for that entire period and sailed back to the United States on the refurbished vessel. He continued to work for Chandris until his employment was terminated approximately one year later.

Alleging negligence on the part of the ship's doctor that resulted in the significant loss of vision in his right eye, Latsis sued Chandris in the United States District Court for the Southern District of New York. A jury verdict was rendered in favor of Chandris, but the judgment entered on that verdict was vacated, and the case was remanded for a new trial following an appeal to this court. *See Latsis v. Chandris, Inc.,* 20 F.3d 45 (2d Cir.1994). The principal error identified by this court was the district court's instruction to the jury to disregard the time spent by Latsis in Bremerhaven when the ship was in drydock in analyzing the issue of seaman status under the Jones Act. Agreeing that the instruction was incorrect, the Supreme Court in *Chandris* took advantage of the occasion to clarify its definition of the term "seaman."

> The Court found it
> well settled after decades of judicial interpretation that the Jones Act inquiry is fundamentally status based: Land-based maritime workers do not become seamen because they happen to be working on board a vessel when they are

injured, and seamen do not lose Jones Act protection when the course of their service to a vessel takes them ashore. *Chandris,* 515 U.S. at 361, 115 S.Ct. 2172.

To determine Jones Act status, the Court rejected a voyage test, which would rely principally on an interpretation that the Act was designed to protect maritime workers exposed to the hazards and perils that characterize work on vessels at sea and makes the activities at the time of injury controlling. The Court noted that a Jones Act remedy may be available to shipyard workers who spend a portion of their working time on shore but spend the rest of their time at sea. However, the Court adopted a rule of thumb that a worker spending less than approximately thirty percent of his time serving a vessel in navigation could not be classified as a Jones Act seaman. *See id.* at 371, 115 S.Ct. 2172. A vessel in drydock, such as the vessel in *Chandris,* may still be considered in navigation unless the "repairs become sufficiently significant that the vessel can no longer be considered in navigation." *Id.* at 374, 115 S.Ct. 2172. In the *Chandris* case, the court determined that the question of vessel in navigation should have been left to the jury. Interestingly enough, three concurring Justices were of the opinion that it was sufficient for Jones Act recovery that the plaintiff in *Chandris* was injured during a voyage on the high seas. *See id.* at 387–88, 115 S.Ct. 2172.

In any event, the remand to the district court in *Chandris* established the rule to be applied in the case before us. The district court was directed to

charge the jury in a manner consistent with our holding that the "employment-related connection to a vessel in navigation" necessary to qualify as a seaman under the Jones Act ... comprises two basic elements: The worker's duties must contribute to the function of the vessel or to the accomplishment of its mission, and the worker must have a connection to a vessel in navigation (or an identifiable group of vessels) that is

substantial in terms of both its duration and its nature. As to the latter point, the court should emphasize that the Jones Act was intended to protect sea-based maritime workers, who owe their allegiance to a vessel, and not land-based employees, who do not.

*Id.* at 376, 115 S.Ct. 2172. *See also Harbor Tug and Barge Co. v. Papai,* 520 U.S. 548, 554, 117 S.Ct. 1535, 137 L.Ed.2d 800 (1997) (applying the rule in *Chandris* ).

At the time of his injury, and since his assignment to terminal duties, Sologub can be said to have contributed to the function of the vessels in the Staten Island ferry fleet and the accomplishment of the mission of the ferries. However, his connection with a vessel in navigation, in terms of both duration and nature, was insufficient when analyzed in light of the Jones Act's intention to protect sea-based maritime workers and not land-based employees. No reasonable jury could find that Sologub was anything but a land-based worker during his assignment to terminal duties. He was engaged in the performance of those duties in "a steady position" from February 22, 1996 until his injury in mid-April of 1996. Even before that, Sologub was engaged in land-based duties between September 26, 1995 and February 22, 1996. During that period, he served only one eight-hour tour aboard a vessel, hardly enough to meet the "duration" test promulgated by the Supreme Court.

Plaintiff argues that Sologub is entitled to a jury determination of his seaman status and offers as relevant evidence the continuity of his service to the City, his imminent assignment to seagoing duty, his earlier sporadic assignments to such duty, his understanding that he was on the first rung of a ladder that would lead to more responsible positions aboard ship, and his exposure to the perils of the sea in the same manner as a deckhand aboard a vessel. These matters do not raise a triable issue of seaman status in this case.

The simple fact is that Sologub's assignment for a considerable length of time prior to the accident was totally land-based. That the City classified as "deckhands" those assigned to terminal duties does not convert a land-based employee to a seaman. While it seems plausible to predict that Sologub could eventually be assigned to duty aboard vessels sailing the seas between Manhattan and Staten Island and that he would eventually even rise in rank to the command of a vessel, we simply cannot allow these predictions to enter into the determination as to whether Sologub met the appropriate test for Jones Act coverage at the time of his injury. The facts before us compel the determination as a matter of law that he did not meet the test.

## CONCLUSION

For the foregoing reasons, we affirm the judgment of the district court.