Shelia L. THOMPKINS, Plaintiff,

v.

John E. POTTER, Postmaster General
of the United States, et al.,
Defendants.

Civil Action No. 3:04–cv–2021(JCH).

United States District Court,
D. Connecticut.

Sept. 1, 2006.

Sheila L. Thompkins, Bridgeport, CT, pro se.

Carolyn Aiko Ikari, U.S. Attorney's Office, Hartford, CT, for Defendants.

## RULING RE DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
### [Doc. No. 31]

HALL, District Judge.

The plaintiff, Shelia L. Thompkins, initiated this action against defendants, John E. Potter, the Postmaster General of the United States, Natalie Caprio, Alvia Elliot, and Frank Davis. In her Complaint[1] (Doc. No. 3), Thompkins alleges disability discrimination in violation of the Rehabilitation Act, 29 U.S.C. §§ 701, *et seq.*, race and sex discrimination in violation of Title VII of the Civil Rights Act, 42 U.S.C. §§ 2000e, *et seq.*, and retaliation in viola-

---

1. 'Thompkins' official Complaint is a United States District Court form complaint. The Complaint incorporates by reference an un-dated, ten-page complaint drafted by Thompkins that more fully details the bases of her allegations.

tion of both the Rehabilitation Act and Title VII.

The defendants bring this Motion for Summary Judgment (Doc. No. 31) pursuant to Rule 56 of the Federal Rules of Civil Procedure. For the following reasons, the defendants' motion is GRANTED.

## I. STANDARD OF REVIEW

In a motion for summary judgement, the burden is on the moving party to establish that there are no genuine issues of material fact in dispute and that it is entitled to judgement as a matter of law. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 256, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *White v. ABCO Engineering Corp.,* 221 F.3d 293, 300 (2d Cir.2000). Once the moving party has met its burden, the nonmoving party must "set forth specific facts showing that there is a genuine issue for trial," *Anderson,* 477 U.S. at 255, 106 S.Ct. 2505, and present such evidence as would allow a jury to find in his favor in order to defeat the motion. *Graham v. Long Island R.R.,* 230 F.3d 34, 38 (2d Cir.2000).

In assessing the record, the trial court must resolve all ambiguities and draw all inferences in favor of the party against whom summary judgement is sought. *Anderson,* 477 U.S. at 255, 106 S.Ct. 2505; *Graham,* 230 F.3d at 38. "This remedy that precludes a trial is properly granted only when no rational finder of fact could find in favor of the non-moving party." *Carlton,* 202 F.3d at 134. "When reasonable persons, applying the proper legal standards, could differ in their responses to the question" raised on the basis of the evidence presented, the question must be left to the jury. *Sologub v. City of New York,* 202 F.3d 175, 178 (2d Cir.2000).

## II. FACTS[2]

Since June 1, 2001, John E. Potter has been the Postmaster General of the United States. For all times relevant to this matter, Natalie Caprio, Alvia Elliot, and Frank Davis were supervisors of distribution operations in the United States Postal Service. All three were stationed at the Postal Service's Southern Connecticut Processing and Distribution Center in Wallingford, Connecticut ("Wallingford") during the events relevant to this action. Elliot was Thompkins' direct supervisor, and Natalie Caprio was Thompkins second-line supervisor. Davis was a Time and Attendance Coordinator for the Postal Service during the events in question. In 1998, Thompkins was a full-time distribution clerk at Wallingford who was also designated as a regular "career" clerk.

Sometime in 1997, Thompkins learned that she was pregnant. On October 28, 1997, Thompkins filed a complaint with the Connecticut Commission on Human Rights and Opportunities ("CHRO") generally alleging race, sex, pregnancy and disability discrimination under the Connecticut Fair Employment Practices Act ("CFEPA"). On November 28, 1997, Thompkins left work for pregnancy-related medical reasons. A December 10, 1997 note to the Management Department of the Postal Service from Dr. Bonney McDowell, Thompkins' obstetrician, indicated that Thompkins' pregnancy had been complicated by uterine fibroids that were causing Thompkins a great deal of pain. Pl. Exh. 19 to Memo in Opposition (Doc. No. 36).[3]

---

2. For the purposes of the instant motion, the court accepts facts undisputed by the parties as true and resolves disputed facts in favor of Thompkins where she provides competent evidence to support her allegations.

3. Hereinafter, the court will cite to exhibits attached to the Plaintiff's Memorandum in Opposition to Summary Judgment and the Defendant's Memorandum in Support of

Dr. McDowell recommended placing Thompkins on medical leave and estimated February 7, 1998 as Thompkins' delivery date. *Id.* However, Thompkins delivered the baby two-months prematurely on December 26, 1997.[4]

On February 25, Thompkins and Elliot, who was representing the Postal Service managers, attended an unemployment compensation hearing that Thompkins requested. By this point, Thompkins had not been to work at the Postal Service since November 1997. Thompkins brought to the hearing a copy of her PHF Life Insurance Authorization of Release Form. The Form contained a notation from Dr. McDowell stating that the "patient was continuously unable to work because of sickness or injury from November 29, 1997 until February 9, 1998," and citing complications with Thompkin's pregnancy as the underlying cause of her absence. Pl. Exh. 22. Thompkins also wrote and signed a statement during the hearing declaring that, "I was released to return to work as of February 9, 1998." Unemployment Claimant and Employer's Statement (Feb. 25, 1998); Pl. Exh. 26. The day after the hearing, February 26, 1998, the Postal Service managers changed Thompkins' employment status from "on medical leave of absence" to "absent without official leave" as of February 9, 1998. Elliot

also sent Thompkins a "Status Check Letter" requesting that Thompkins report to work immediately and noting that "[f]ailure to respond to this notice immediately, will result in the initiation of the disciplinary procedures up to and including removal." Status Check Letter from Elliot to Thompkins, Feb. 26, 1998; Pl. Exh. 27.

Thompkins' replied to the Status Check Letter on March 12, 1998, when she wrote to Supervisor James Porter to request leave pursuant to the Federal Medical Leave Act ("FMLA").[5] Pl. Exh. 30. In the letter, Thompkins anticipated returning to work by June 29, 1998. *Id.* Attached with the request was a letter from Dr. McDowell written on March 9, 1998 clarifying that Thompkins required surgery to remove fibroid tumors. *Id.* McDowell's letter further stated that Thompkins would be hospitalized for five days following surgery, and would need an additional six to eight weeks for recovery. *Id.* Elliot denied Thompkins' request for leave on March 17, 1998, allegedly because Thompkins had not worked the requisite number of hours to obtain FMLA benefits. Thompkins underwent a total abdominal hysterectomy on March 30, 1998, and her doctor did not expect her to be able to return to work until May 13, 1998. Physician's Certification of Claimant's Health

---

Summary Judgment by their exhibit number only.

4. The parties dispute whether Thompkins notified anyone in Postal Service management about her early delivery. The only documents Thompkins submits to prove notice are a Health Benefits Registration Form that Carolyn Hood received on January 7, 1998, Pl. Exh. 94, and a PHF Life Insurance Authorization of Release Form dated January 12, 1998, Pl. Exh. 22. There is nothing in the record to indicate that any of the defendants were actually or constructively aware of these documents.

5. Earlier, on February 26, 1998, Thompkins wrote the Wallingford–New Haven Postmaster stating, once gain, that she had been released to return to work on February 9, 1998. Pl. Exh. 29. Thompkins went on to state that she had not returned to work "due to undue stress, and problems I am having with my present Supervisor (Alvia Elliot)." *Id.* She also states that she could no longer work her regular hours of 5:30 p.m. to 2:00 a.m. due to child care issues, and requested hours between 9:00 a.m. and 9:00 p.m. *Id.*

(May 12, 1998); Pl. Exh. 38.[6]

A few weeks later on April 9, 1998, Elliot officially requested disciplinary action against Thompkins, allegedly on the grounds that the latter had been on AWOL status since February 9, 1998. Elliot's request was granted and, on April 16, 1998, the Postal Service, via Elliot, sent Thompkins a "Notice of Removal" terminating Thompkins position with the Postal Service. Pl. Exh. 34. The Notice cited Thompkins AWOL status since February 9, 1998 and the inadequacy of Thompkins' request for FMLA leave in explaining her absence as the primary reasons for removal. *Id.* The removal became effective on June 6, 1998. *Id.* However, Herbert Marx, a labor arbitrator with the Postal Service, reversed Thompkins' removal, stating the action had been taken without just cause. *In re Matter of Arbitration between United States Postal Service and American Postal Workers Union,* Case No. B94C–1 B–D 98106506 at 7 (Dec. 28, 1998). Marx found that, while Thompkins' three year attendance record warranted discipline, removal was unwarranted. *Id.* at 3. Marx then ordered that the Postal Service reinstate Thompkins immediately "with seniority unimpaired in a position to which her seniority entitles her." *Id.* at 7. Shortly after Marx's decision, the Postal Service notified Thompkins that she could report to work on January 9, 1999. Letter from Natalie Caprio to Thompkins, Jan. 6, 1999.

After Thompkins' reinstatement, she alleges a number of adverse incidents. The first is that, on March 1, 1999, Thompkins filled out paperwork with Wallingford's Personnel/Human Resources Office in an attempt to reinstate her health care benefits following her return to work. Unfortunately, the personnel office did not process Thompkins' registration until October 14, 1999. The Postal Service maintains that this delay was due to the confusion caused following a personnel officer's six-month medical leave from the office.

The next incident is that, sometime in 1999, the Postal Service underwent a department-wide reorganization that had been negotiated and agreed to by the union. As a result of the reorganization, the Postal Service reclassified and vacated Thompkins' position on September 24, 1999. Thompkins claims that her vacated position was given to a senior white male employee, without notification to her. Meanwhile, management moved Thompkins' work station. It also altered her job within manual distribution such that Thompkins was sorting letters instead of magazines. There is no dispute that, beyond these changes, Thompkins new job was essentially the same position, offering the same pay, and involving the same basic functions as before.

On November 10, 1999, Davis, a Postal Time and Attendance Coordinator, sent Thompkins a Status Check Letter, stating that Thompkins had not reported to work since October 15, 1999. Def. Exh. I. The letter requested that Thompkins properly document her absences or face disciplinary proceedings "up to and including removal." *Id.* Apparently in response to a response from Thompkins at least partially explaining her absences, Pl. Exh. 82, Davis sent a second Status Check Letter to Thompkins on December 3, 1999. Def. Exh. J. Davis stated that the November 10 letter should have indicated that Thompkins had been absent since October 16, not October 15. *Id.* Thompkins maintains that Davis' status check was unjustified.

---

6. Because Thompkins did not fill out this insurance form until May 12, 1998, there appears to be nothing in the record indicating that the defendants were aware of Thompkins' surgery or her estimated recovery time before issuing the notice of removal.

The last incident about which Thompkins complains is that, at an unspecified point in 1999, Elliot accused Thompkins of being thirty minutes late returning from one of her duty stations. Though Thompkins claims that this was a stressful negative exchange, no discipline or further warnings were ever issued.

## III. DISCUSSION

### A. Thompkins' Disability Discrimination Claim under the Rehabilitation Act

■ The court first addresses Thompkins' claim that the defendants' attempted termination and subsequent treatment of her constitutes disability discrimination under the Rehabilitation Act. The defendants argue that Thompkins cannot prevail on her claim as a matter of law because she is not disabled within the meaning of the Rehabilitation Act. Based on the evidence submitted by the parties, this court is persuaded that Thompkins cannot establish that she is disabled. Consequently, the court grants summary judgment on this claim.

The Rehabilitation Act states that, "[n]o otherwise qualified individual with a disability ... shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal assistance." 29 U.S.C. § 794(a). A "disabled individual" is one who "(I) has a physical or mental impairment which substantially limits one or more of such person's major life activities, (ii) has a record of such an impairment, or (iii) is regarded as having

such an impairment." 29 U.S.C. § 705(20)(B). Thompkins' theory of recovery as a disabled individual is premised on the first definition, in that, due to two on-the-job accidents she had in 1990 and 1992, respectively, Thompkins suffered permanent partial disabilities to her hand, wrist, neck, shoulder, and spine. According to Thompkins, these injuries substantially limit her ability engaging in several major life activities.[7] For example, Thompkins claims that she is not able to engage in prolonged standing or walking, has difficulty caring for herself, and has difficulty performing a number of manual tasks.

The court assumes for the purposes of this motion that Thompkins does have a permanent partial disability and that at least some of the areas she cites constitute major life activities. However, Thompkins has put forward only a scintilla of evidence to indicate that she is substantially limited in these major life activities by her physical impairment. Thompkins' most recent evidence of her alleged disability is a March 17, 1994 letter from the Department of Labor accepting her claim for disability compensation with respect to her back injury. Pl. Exh. 2(P). Yet there is nothing between March 17, 1994 and February 26, 1998 (the date on which Elliot sent Thompkins a Status Check Letter) documenting Thompkins' condition.[8] Absent such a showing, this court is unwilling to accept that Thompkins can establish disability with a nearly four-year vacuum of evidence. See *Colwell v. Suffolk County Police Dep't*, 158 F.3d 635, 641 & 643–45 (2d Cir.1998) (concluding plaintiff could not prove disability because record insufficient

---

7. Though not raised by either of the parties, this court sees no basis in the record before the court to conclude that Thompkins either has a record of impairment or was regarded as having an impairment by anyone in the Postal Service.

8. Some of the evidence Thompkins cites to establish disability relate to her fibroids surgery, but none of these documents relate how the surgery limited her in major life activities.

as to substantial limitation of major life activity). The court, therefore, grants summary judgment on Thompkins claims of disability discrimination under the Rehabilitation Act.

### B. Thompkins' Title VII Claims

■ This court first recognizes that any of Thompkins' claims for relief under Title VII are only properly brought against Potter. Only employers, and not individuals merely with supervisory control over an employee, can be held liable under Title VII. *Wrighten v. Glowski*, 232 F.3d 119, 120 (2d Cir.2000); *Tomka v. Seiler Corp.*, 66 F.3d 1295, 1314–15 (2d Cir.1995).

### C. Thompkins' Title VII Disparate Treatment Claim Relating to Her Termination

■ Next, this court examines Thompkins' claim that the Postal Service managers attempted to terminate her on the basis of race and sex. The analysis of whether the Postal Service subjected Thompkins to disparate termination must proceed under the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). *See Fitzgerald v. Henderson*, 251 F.3d 345, 356 (2d Cir. 2001). The plaintiff is first required to establish a prima facie case of discrimination. *See Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 252–53, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). A prima facie case for disparate treatment is established by showing that 1) the plaintiff is a member of a protected class; 2) the plaintiff performed her job adequately; 3) the plaintiff suffered an adverse employment action (termination); and 4) that the adverse employment action occurred under conditions giving rise to an inference of discrimination. *Burdine*, 450 U.S. at 254, 101 S.Ct. 1089. Once a plaintiff has estab-

lished a prima facie case, a rebuttable presumption of discrimination arises, and the burden shifts to the defendant to offer a legitimate, non-discriminatory reason for its actions. *See id.* Upon the employer's articulation of a nondiscriminatory reason for the employment action, the presumption of discrimination that arises with the establishment of the prima facie case drops out. *See St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 510–11, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993). The burden then shifts back to the plaintiff to fulfill her ultimate burden of proving that the defendant intentionally discriminated against him in the employment action. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 143, 120 S.Ct. 2097, 147 L.Ed.2d 105, (2000). In order to satisfy this burden, the plaintiff may attempt to prove that the legitimate, non-discriminatory reason offered by the defendant was not the employer's true reason, but was a pretext for discrimination. *Id.*

■ A prima facie case combined with a showing that an employer's asserted justification is false is sometimes, but not always, sufficient to permit a discrimination claim to survive summary judgment. *Schnabel v. Abramson*, 232 F.3d 83, 89–91 (2d Cir.2000) (citing *Reeves*, 530 U.S. at 142, 120 S.Ct. 2097). The court must "examin[e] the entire record to determine whether the plaintiff could satisfy his 'ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff.'" *Schnabel*, 232 F.3d at 90 (quoting *Reeves*, 530 U.S. at 143, 120 S.Ct. 2097, 147 L.Ed.2d 105). The plaintiff need not show that sex or race was the only factor motivating any adverse employment actions she suffered in order to make a showing of employment discrimination. *See* 42 U.S.C. § 2000e–2(m); *Desert Palace, Inc. v. Costa*, 539 U.S. 90, 123 S.Ct. 2148, 156 L.Ed.2d 84 (2003).

"The 'ultimate issue' in an employment discrimination case is whether the plaintiff has met her burden of proving that the adverse employment decision was motivated at least in part by an 'impermissible reason,' i.e., a discriminatory reason," regardless of whether the case is presented as one of single or dual motive. *Stratton v. Dep't for the Aging for New York,* 132 F.3d 869, 878 (2d Cir.1997).

█ The defendants do not challenge whether Thompkins has made out a prima facie case of disparate termination. Instead, Potter asserts that Thompkins has not shown that the proffered reason for Thompkins' termination is pretextual. The court agrees. To justify Thompkins' termination, Potter asserts that Thompkins never alerted the Postal Service that she was able to return to work on February 9, 1998 and never offered documentation for her absences after February 9, 1998. Rule 56(a) 1 Statement at ¶ 21. Beyond her conclusory statement that the Postal Service managers were without just cause to terminate her, the record is devoid of any evidence that Elliot or anyone else at the Postal Service terminated Thompkins on the basis of race or sex. Thus, looking to the record as a whole, the court must conclude that Thompkins will be unable to satisfy her ultimate burden of proving that her termination resulted from a discriminatory motive.

### C. Thompkins' Title VII Disparate Treatment Claims Relating to Her Post–Termination Treatment

Thompkins' also claims that the defendants' treatment of her after her June 6, 1998 termination constitutes disparate treatment under Title VII. Specifically, Thompkins asserts that the denial of her FMLA benefits, the issuance of status check letters, the delay in reinstating her health care benefits, the change of her work station, and Elliot's accusing Thompkins' of being late for a shift change were all adverse employment actions taken on the basis of her race and sex. The defendants argue that none of these actions was actually "adverse" within the meaning of Title VII. With the exception of Elliot's denial of Thompkins' FMLA benefits, the court agrees.

█ The Supreme Court recently pronounced that an adverse employment action must be "materially adverse", in that it would "dissuade[ ] a reasonable worker from making or supporting a charge of discrimination." *Burlington Northern & Santa Fe Railway Co. v. White,* — U.S. ——, 126 S.Ct. 2405, 2415, 165 L.Ed.2d 345 (2006). Material adversity must be the focus in determining whether an adverse employment action has occurred because "it is important to separate significant from trivial harms." *White,* 126 S.Ct. at 2415. The Supreme Court's language and intent in *White* appear entirely consistent with Second Circuit precedent, which defines an adverse employment action as a "materially adverse change in the terms and conditions of employment [that] is more disruptive than a mere inconvenience or an alteration of job responsibilities." *Fairbrother v. Morrison,* 412 F.3d 39, 56 (2d Cir.2005). Prototypical examples of adverse employment actions include termination, demotion via a reduced wage, salary, or job title, a material loss of benefits, or significantly reduced responsibilities. *Demoret v. Zegarelli,* 451 F.3d 140, 151 (2d Cir.2006) (citation omitted).

█ Turning to the instant case, receiving status check letters—which involves a Postal Service Manager requesting that an employee explain her absence or suffer discipline—does no more than inconvenience an employee with having to explain why she did not report to work or prove that she did in fact report to work

during the period in question. The court is unprepared to find that this action can be considered adverse.

Likewise, Thompkins' delay in having her health care benefits restored is not an adverse employment action. The record is clear that Thompkins' paid no out-of-pocket expenses for medical treatment she received during this period and, the one time a treatment provider denied service, Thompkins was able to call the insurance company directly to rectify the situation.

With respect to Thompkins having her work station moved, there is no dispute that a new location and having to sort magazines rather than letters were the only two differences between her prior position and the one into which the Postal Service transferred her. Considering that Thompkins' salary, position, and responsibilities were exactly the same, there is nothing material about Thompkins' move. *See Demoret*, 451 F.3d at 151 (finding no adverse employment action where defendants forced plaintiff to switch to an office she viewed as less desirable); *cf. White*, 126 S.Ct. 2405 (finding that plaintiff's reassignment from forklift duty to standard track laborer was materially adverse because, *inter alia*, former position was considered more prestigious by virtue of requiring more skill, was significantly less physically arduous, and was objectively considered a better job by employees).

Lastly, this court can find no basis from which to conclude that being asked to explain tardiness, even if there is a dispute as to tardiness, satisfies the adverse employment action test. Thompkins herself admits that the exchange was nothing more than unpleasant.

 By contrast, the denial of Thompkins' benefits under FMLA is almost certainly adverse. A denial of these benefits could force an employee to work without adequate child care resources, or take unpaid time off from work to personally provide child care. The defendants challenged Thompkins' prima facie showing on this claim by stating that they denied Thompkins' request because she had not worked the requisite 1250 hours needed to qualify for FMLA benefits. Thompkins has rebutted the factual basis of this proffer with pay stubs indicating she did work the mandated 1250 hours. But Thompkins offers no additional evidence from which a juror could reasonably infer that the denial of FMLA benefits, while perhaps technically improper, was done because of discriminatory animus. Therefore, this court must grant summary judgment on Thompkins' disparate treatment claims.

### D. Thompkins' Retaliation Claims Under Title VII and the Rehabilitation Act

Lastly, this court turns to Thompkins' claims under Title VII and the Rehabilitation Act that her June 6, 1998 termination was done in retaliation for her October 27, 1997 complaint to the CHRO. According to the Potter, Thompkins cannot prevail on these claims because she either cannot make out a prima facie case of retaliation or cannot show that the proffered reason for her termination is pretextual. Because this court agrees with Potter that the record as a whole cannot support a finding of discrimination, it grants summary judgment on her retaliation claims.

 Under both the Rehabilitation Act and Title VII, a plaintiff alleging retaliation must establish "participation in a protected activity known to the defendant; an employment action disadvantaging the plaintiff; and a causal connection between the protected activity and the adverse employment action." *Quinn v. Green Tree Credit Corp.*, 159 F.3d 759, 769 (2d Cir.

1998) (Title VII standard for retaliation); *Weixel v. Bd. of Educ. of the City of New York,* 287 F.3d 138, 148 (2d Cir.2002) (Rehabilitation Act standard for retaliation). Within the context of Title VII and Rehabilitation Act, a " 'protected activity' refers to action taken to protest or oppose statutorily prohibited discrimination." *Cruz v. Coach Stores, Inc.,* 202 F.3d 560, 566 (2d Cir.2000) (citing 42 U.S.C. § 2000e–3).

▉ The defendants challenge Thompkins' prima face showing by asserting that Thompkins cannot demonstrate that she was terminated because of her CHRO complaint. They also claim that Thompkins cannot establish that any of her Postal Service managers knew she had filed a complaint with the CHRO. As to this last point, Thompkins claims that the defendants had to know that she made her CHRO complaint. Her sole piece of evidence on this point is the fact that James Friedman, an attorney for the Postal Service, responded to the CHRO concerning Thompkins by asserting that the CHRO lacked jurisdiction over federal employees. Letter from Friedman to CHRO, Feb. 2, 1998; Pl. Exh. 24. From this letter, Thompkins argues that Friedman must have notified the defendants of her complaint in order to properly respond to the CHRO. Given that Friedman grounded his response to the CHRO in jurisdiction, the court has difficulty concluding that Friedman necessarily would have alerted the Postal Service managers about the complaint. However, the defendants have offered no affirmative evidence disproving Thompkins' claim, such as testimony from Friedman stating whom he notified about the CHRO letter. Though an extremely close call, this court finds that Thompkins has satisfied her prima facie burden for retaliation.

▉ Since Thompkins makes out prima facie retaliation case, the burden of production shifts to Potter to articulate a legitimate, non-discriminatory basis for her termination. *See Feingold v. New York,* 366 F.3d 138, 157 (2d Cir.2004). As noted above, Potter maintains that Thompkins was fired for her AWOL status and failure to document her absences. Thompkins has not put forward any evidence to satisfy her ultimate burden of proof to expose Potter's rationale as pretextual. *See Feingold,* 366 F.3d at 157. For one, Elliot took no negative action against Thompkins until after the February 25, 1998 unemployment benefits meeting, a meeting Thompkins initiated. At this meeting, Elliot discovered that Thompkins had conceivably been able to work since February 9, 1998; yet, she offered no justification for her absence. Still, Elliot did not send Thompkins' Notice of Dismissal until April 16, 1998. Though there is no magic number for these determinations, this court cannot find pretext on the current record considering that Thompkins' CHRO complaint occurred nearly half of a year prior to Elliot's Notice of Removal. *See Hollander v. Am. Cyanamid Co.,* 895 F.2d 80, 85 (2d Cir.1990) (failing to find a causal connection where the time between the protected activity and the adverse employment action was three months); *see also Holt v. KMI–Continental, Inc.,* 95 F.3d 123, 130 (2d Cir.1996) (finding no evidence of a causal connection where the protected action took place between one and three months before plaintiff was discharged). Considering the paucity of Thompkins' prima facie showing and the absence of any evidence establishing pretext, the court finds that Thompkins has failed to create a genuine issue of material fact on her retaliation claim. Consequently, the court grants summary judgment on the rehabilitation claims.

**IV. CONCLUSION**

Based on the foregoing analysis, the defendants' Motion for Summary Judgment

(Doc. No. 31) is GRANTED. Therefore, Thompkins' Complaint [Doc. No. 3] is DISMISSED. The clerk is hereby directed to close the case.

**SO ORDERED.**