Nitor V. EGBARIN, Plaintiff,

v.

AMERICAN EXPRESS COMPANY,
et al, Defendants.

No. 3:03–CV–1907(JCH).

United States District Court,
D. Connecticut.

Sept. 14, 2006.

Nitor V. Egbarin, Simsbury, CT, Pro se.

Glenn A. Duhl, Siegel, O'Connor, O'Donnell & Beck, P.C., Hartford, CT, for Defendants.

## RULING RE DEFENDANTS' MOTION FOR SUMMARY JUDGMENT [DOC. NO. 100]

HALL, District Judge.

The plaintiff, Nitor V. Egbarin, initiated this action against defendants, American Express Company ("AMEX"), American Express Financial Advisors, Inc. ("AEFA"), and John Laurito. In his Second Amended Complaint [Doc. No. 43], filed on June 21, 2004, Egbarin alleges race, color and/or nationality-based discrimination against all the defendants under Section 1981 of Chapter 42 of the United States Code. Egbarin also alleges race, color and/or nationality-based discrimination against AMEX and AFA under Title VII of the Civil Rights Act of 1964, as amended by the Civil Rights Act of 1991, 42 U.S.C. § 2000e–2. Lastly, Egbarin asserts fraudulent and negligent misrepresentation against all defendants under the law of the State of Connecticut. This court has jurisdiction over Egbarin's supplemental state law claims pursuant to Section 1367 of Chapter 28 of the United States Code.

The defendants bring this Motion for Summary Judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure [Doc. No. 100]. For the following reasons, the defendants' motion is GRANTED.

1. For the purposes of the instant motion, the court accepts facts undisputed by the parties as true and resolves disputed facts in favor of Egbarin where he provides evidence to support his allegations.

## I. STANDARD OF REVIEW

In a motion for summary judgement, the burden is on the moving party to establish that there are no genuine issues of material fact in dispute and that it is entitled to judgement as a matter of law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *White v. ABCO Engineering Corp.*, 221 F.3d 293, 300 (2d Cir.2000). Once the moving party has met its burden, the non-moving party must "set forth specific facts showing that there is a genuine issue for trial," *Anderson*, 477 U.S. at 255, 106 S.Ct. 2505, and present such evidence as would allow a jury to find in his favor in order to defeat the motion. *Graham v. Long Island R.R.*, 230 F.3d 34, 38 (2d Cir.2000).

In assessing the record, the trial court must resolve all ambiguities and draw all inferences in favor of the party against whom summary judgement is sought. *Anderson*, 477 U.S. at 255, 106 S.Ct. 2505; *Graham*, 230 F.3d at 38. "This remedy that precludes a trial is properly granted only when no rational finder of fact could find in favor of the non-moving party." *Carlton*, 202 F.3d at 134. "When reasonable persons, applying the proper legal standards, could differ in their responses to the question" raised on the basis of the evidence presented, the question must be left to the jury. *Sologub v. City of New York*, 202 F.3d 175, 178 (2d Cir.2000).

## II. FACTS [1]

At all times relevant to this Second Amended Complaint, AEFA was a Delaware corporation and subsidiary of American Express Financial Corporation ("AEFC").[2] AEFC, in turn, was a subsid-

2. On August 1, 2005, American Express Financial Corporation was renamed Ameriprise Financial, Inc., and American Express Financial Advisors was renamed Ameriprise Financial Services, Inc.

iary corporation of AMEX, a New York public corporation. Both AMEX and AEFA are dully licensed to do business in Connecticut. Laurito, a Connecticut resident, was a Field Vice President for AEFA's East Hartford office. Laurito has worked in the East Hartford office since March of 2002. Egbarin is an African American of Nigerian descent who was a financial advisor for AEFA's East Hartford office. Egbarin was a financial advisor in East Hartford from December 12, 2001 until his termination on January 13, 2003.

First in May or June of 2002, then again on November 8, 2002, Egbarin made formal requests to Laurito for approval to obtain a license to conduct business as a financial advisor in the State of Texas. Federal and state laws and regulations required AEFA financial advisors to be properly licensed and registered in any state in which they solicit and service clients. Within AEFA, if a financial advisor attempted to conduct business with a customer in a state in which that advisor was not licensed, AEFA's Compliance Department in Minneapolis would block the transaction. AEFA's policies for advisor applications for out-of-state licenses are contained in various pieces of AEFA literature. *See, e.g.,* Field Bulletin 4115; Field Bulletin 3547; Marketing, Resource, and Lead Distribution Policies: East Hartford.

On November 8, 2002, Laurito approved Egbarin's request to file an application for the Texas license. Egbarin was to file his request with Cindy Terrein, AEFA's office manager. The parties disagree on the conditions Laurito imposed upon Egbarin before granting this request. Egbarin maintains that Laurito only agreed to let Egbarin apply for a license if Egbarin agreed to solicit business in Texas illegally on a trip Egbarin planned for the upcoming weekend. Laurito denies this charge,

countering that the only reason he granted Egbarin's request was because Egbarin indicated he had a good business opportunity in Texas.

In any event, the parties do not dispute that sometime between November 8 and November 15, 2002, Egbarin conducted business in Texas before he properly submitted his paperwork to Terrein. Egbarin attempted to submit his Texas application to Terrien officially on Friday, November 15, 2002. For reasons that are disputed but not material to this discussion, Terrien refused to accept Egbarin's application because she suspected that he had improperly solicited clients in Texas without a license. That same day, Egbarin admitted to Laurito that he had obtained two personal checks—one check for $750 for an annual financial advisory and planning fee, and one check for $150, 000 to be deposited as a financial product investment—as a result of his endeavors in Texas.

On December 11, 2002, Laurito sent Egbarin a letter informing Egbarin that AEFA's Compliance Department was issuing him a Letter of Reprimand with respect to his unlicensed solicitation of business in Texas. The Letter of Reprimand subjected Egbarin to a "Compliance Action Plan" which, among other things, instituted a six-month probationary period—running from December 11, 2002 thru June 11, 2002—during which Egbarin was placed under heightened supervision. Memo re: Letter of Reprimand, December 11, 2002, Ex. KK to Rule 56(a)(1) Statement. The Letter of Reprimand was also to become a permanent part of Egbarin's compliance file. Egbarin signed the Letter of Reprimand on December 16, 2002, endorsing a statement that, "I have read this Letter of Reprimand and fully understand and agree to its content." *Id.*

A separate issue in this case concerns "paid time off" ("PTO") benefits that Eg-

barin attempted to obtain for a trip to Nigeria. AEFA employees are generally entitled to a certain number of paid, discretionary vacation days that they can schedule "for any reason in accordance with departmental procedures." AEFA Paid Time Off Policy, Ex. 14 to Rule 56(a)(2) Statement. AEFA policy states that, "with management approval, PTO days can be scheduled at any time throughout the calendar year, but must be taken in the calendar year in which they are earned." *Id.* The policy further states that, "in the event a conflict exists among PTO requests, the department manager will approve PTO according to the operating needs of the department." *Id.* Within the policy is also the statement that PTO is meant to further the diversity goals of AEFA, so care is taken to provide employees "flexibility to take off days that are important to them." *Id.* It appears, however, that employees operate with some limitations when scheduling PTO days. An employee is entitled to all of their PTO days in a calendar year, but "scheduling of PTO days is still subject to leader approval." Field Bulletin 4156A at p. 2, Ex. LL to Rule 56(a)(1) Statement. As a result, AEFA maintains that a leader "may approve or deny the request based on your market group's business needs." *Id.*

On December 3, 2002, Egbarin requested by email a meeting with Laurito to discuss Egbarin's desire to take ten days of PTO for sometime in January or early February of 2003. Email from Egbarin to Laurito (December 3, 2002, 11:12 EST), Ex. NN to Rule 56(a)(1) Statement. At the time of the email, Egbarin purportedly "[had] not decided on the exact period." *Id.* Laurito agreed to a meeting, but added, "PTO time does need to be balanced with the effect it would have on your business ... so lets [sic] talk about what productivity levels you would need to achieve first. I'm sure we can come up with some-

thing that works." Email from Laurito to Egbarin (December 3, 2002, 11:28 EST), Ex. NN to Rule 56(a)1 Statement. Egbarin claims that on December 21, 2002 he bought an airline ticket and made travel arrangements for his trip to Nigeria in reliance on Laurito's statement that he and Egbarin could agree on "something that works."

After the December 3 exchange, the next documented interaction between Egbarin and Laurito did not take place until December 23, 2002, two days after Egbarin had already made his travel arrangements. Egbarin informed Laurito on that day that he would be using his last three days of PTO for the end of 2002 and, in addition, would be taking PTO days from January 2 thru January 10, 2002. Email from Egbarin to Laurito (December 23, 2002, 11:02 EST), Ex OO to Rule 56(a)(1) Statement. Egbarin planned to return on January 13, 2003. *Id.* Laurito essentially responded that, because Egbarin had not been adequately meeting productivity goals, his "PTO request for January 2–10th [was] not approved." Email from Laurito to Egbarin (December 26, 2002, 13:08 EST), Ex. OO to Rule 56(a)(1) Statement. Subsequent to this email exchange, Egbarin and Laurito met on December 26, 2002 to discuss Egbarin's PTO request. The exact contours of this meeting are heavily contested. Most relevant to this court's purposes is Egbarin's claim—in a personal affidavit he submitted along with his Opposition to Summary Judgment—that at this meeting he told Laurito that other white advisors had taken PTO without being forced to meet productivity requirements.

After Egbarin met with Laurito, he sent Laurito an email arguing that Laurito could only deny discretionary days for scheduling conflicts, not for productivity concerns. Email from Egbarin to Laurito

(December 26, 2002, 17:41 EST), Ex. OO to Rule 56(a)(1) Statement. Laurito responded by email four days later that Egbarin's request for ten consecutive PTO days in January "would have a severe negative impact on your practice at this time." Email from Laurito to Egbarin (December 30, 2002, 18:09 EST), Ex. OO to Rule 56(a)(1) Statement. Egbarin nonetheless left for Nigeria. He returned to AEFA on January 13, 2003.

Upon Egbarin's return, Laurito invited Egbarin to lunch outside AEFA's East Hartford Office. There, Laurito fired Egbarin for voluntary job abandonment.

## III. DISCUSSION

### A. Hostile Work Environment Claim

Egbarin claims that the defendants created a hostile work environment within the meaning of Title VII and Section 1981.[3] Egbarin bases this claim on the alleged pattern of discriminatory behavior at the East Hartford office and AEFA generally. The defendants counter that Egbarin cannot establish that any of the their actions toward him were racially motivated. Further, they maintain that, even if these actions were racially motivated, they do not rise to the level of severity necessary to constitute a hostile work environment. Because Egbarin's evidence, even given the most favorable interpretation allowed under Rule 56, could not support a jury finding in his favor on his hostile work environment claim, the court grants summary judgment on this claim.

To prevail on a hostile work environment claim, a plaintiff must establish that her workplace was "permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993) (citations omitted). In *Harris*, the Supreme Court outlined a two part test for proving a hostile work environment. The first part of the test asks whether the conduct in question was objectively hostile or, in other words, whether the employer's actions created "an environment that a reasonable person would find hostile or abusive." *Harris*, 510 U.S. at 21, 114 S.Ct. 367. Determining whether the work environment was objectively hostile is accomplished by examining the totality of the circumstances. *Williams v. County of Westchester*, 171 F.3d 98, 100 (2d Cir.1999). A nonexclusive list of the factors a court may consider includes "the frequency and severity of the discriminatory conduct, whether such conduct is physically threatening or humiliating, and whether the conduct unreasonably interferes with the plaintiff's work performance." *Williams*, 171 F.3d at 100 (citing *Harris*, 510 U.S. at 23, 114 S.Ct. 367). No single factor is required or dispositive. *Schiano v. Quality Payroll Systems, Inc.*, 445 F.3d 597, 605 (2d Cir.2006). If the plaintiff can make this showing, he must then satisfy the court that he subjectively perceived the work environment as abusive. *Id.* at 21–22, 114 S.Ct. 367. The demonstrated effects that the work environment had on the plaintiff's mental well being are very pertinent to deciding whether the plaintiff actually viewed his surroundings as intolerable. *Id.* at 23, 114 S.Ct. 367.

---

**3.** The parties agree that all of Egbarin's claims under Title VII and Section 1981 should be addressed under the same framework. Because Egbarin alleges racial discrimination, and there appears to be no conflict between the statutes with respect to this case, this court will accept the parties' invitation to analyze the two statutes concurrently. *See Martin v. Citibank, N.A.*, 762 F.2d 212, 216–17 (2d Cir.1985).

■ By and large, a plaintiff cannot establish a hostile work environment if the incidents complained of are isolated, unless those incidents "are of sufficient severity to alter the terms and conditions of employment." *Demoret v. Zegarelli*, 451 F.3d 140, 149 (2d Cir.2006) (citing *Patterson v. County of Oneida*, 375 F.3d 206, 227 (2d Cir.2004)). In addition, the Second Circuit has made explicit the Supreme Court's underlying requirement that a plaintiff must adduce "a specific basis for imputing the conduct creating the hostile work environment to the employer." *Feingold v. New York*, 366 F.3d 138, 150 (2d Cir.2004) (citing *Alfano v. Costello*, 294 F.3d 365, 373 (2d Cir.2002)).

■ The question of whether a work environment is hostile under Title VII and section 1983 is primarily one of fact. *See Holtz v. Rockefeller & Co.*, 258 F.3d 62, 75 (2d Cir.2001). Thus, the court's role on a motion for summary judgment is inherently limited. It must limit itself to deciding only "whether a reasonable factfinder could conclude . . . that the harassment is of such quality or quantity that a reasonable employee would find the conditions of her employment *altered for the worse.*" *Schiano* 445 F.3d at 600 (quoting *Whidbee v. Garzarelli Food Specialties, Inc.*, 223 F.3d 62, 70 (2d Cir.2000)). As the Second Circuit has cautioned, "[a]n Article III judge is not a hierophant of social graces," and there is no defensible justification for the belief that courts are superior to juries in demarcating the boundary between merely inappropriate conduct and legally abusive racism. *See Gallagher v. Delaney*, 139 F.3d 338, 347 (2d Cir.1998).

■ Turning to the case at bar, Egbarin cites a number of reasons to support his claim that his work environment at AEFA was hostile. The first is the lack of diversity within AEFA. When Egbarin became a financial advisor under his former supervisor Fitzsimmons, four of the twenty-six financial advisors in the East Hartford office were black. Egbarin Aff. at ¶ 6. Egbarin then compares this to the office's lower racial diversity as of November 11, 2005, nearly two years after Egbarin's termination in January of 2003. *See* Cindy Terrein Depo. at 25:13—26:20 (stating that only one of thirty advisors was black, and none of the six staff members was black). Though Egbarin cites Terrein's deposition as proof that Laurito's selection process is to blame for the reduced number of black employees, this court can find no support in the record for this sweeping suggestion. At most, Terrein's deposition establishes that the applicant pool is more diverse than the office's make-up, and that Laurito makes final offers to candidates after a face-to-face interview. Terrein Depo at 37:10—42:4. Between the application and Laurito's interview, applicants must first pass an assessment test, meet with a manager to decide if they wish to continue in the process, and then pass a call simulation performed by a third-party vendor. Terrein Depo at 38:6—39:14. By the final interview with Laurito, the number of blacks in the pool drops significantly. *Id.* at 40:18—41:4.[4] Egbarin presents no evidence that Laurito instituted or advocated for this selection process, that this was the process in place while Egbarin was employed at AEFA, or that Laurito in any way prevented blacks from working at AEFA during Egbarin's tenure.

Next, Egbarin asserts that, within this allegedly discriminatory culture at AEFA,

---

**4.** Egbarin also presents evidence that one other AEFA field office in Holyoke had only one black advisor out of twenty. However, Egbarin never worked in this office, and Laurito was not in charge of its hiring. Thus, this evidence is irrelevant to the questions of whether Egbarin's work environment was hostile.

the defendants issued Egbarin a written reprimand for soliciting business in Texas when white employees were not as severely sanctioned, steered lucrative accounts or cases to white financial advisors rather than Egbarin, denied him discretionary time off until Egbarin met productivity requirements that were not imposed on white employees, and terminated him for taking this time off over Laurito's objection. Egbarin further claims that Robert Turbidy, an AEFA employee whose performance was supposedly inferior to Egbarin's, was promoted to field vice president on December 13, 2002.[5] Egbarin's final assertion as to his hostile work environment is that Terrein subjected him to suspicion and humiliation with respect to Egbarin's Texas dealings. This suspicion is allegedly bolstered by the fact that Laurito, believing Egbarin to be violent, took Egbarin to an off-site location to fire him. Apparently, Laurito had never taken such a measure before.

The court begins by noting that Egbarin's final assertion is wholly unsupported by the record and will not be considered. To show that he was subjected to Terrein's suspicion, Egbarin cites to Laurito's deposition testimony that Terrein made certain comments to him concerning her belief that Egbarin was conducting improper business in Texas. Egbarin has no evidence that he was even aware of Terrein's suspicion while he worked at AEFA. Nor does Egbarin's presentation establish that Terrein suspected him of wrong doing because he was black. What makes this assertion most absurd is the fact that Egbarin openly admits that he did in fact illegally conduct business in Texas, just as Terrein suspected. Egbarin Aff. at ¶ 17.

In addition, Egbarin has failed to come forward with admissible evidence creating a material issue of fact as to his hostile environment claim that the defendants steered lucrative accounts away from him in favor of white employees. In his affidavit accompanying his Opposition to Summary Judgment, Egbarin only states, "I have been told that managers of the defendants, American Express, regularly steered lucrative accounts to white advisors." Egbarin Aff. at ¶ 87. This information apparently comes from John Kelliher, who detailed the basis for this accusation on May 23, 2003 in an makeshift interview conducted by Egbarin. This court will discuss the evidentiary merit of this evidence later, but whatever steering did or did not occur, Egbarin can point to nothing in the record showing his awareness of this practice during his time at AEFA. Thus, the substance of the account is irrelevant to the issue before this court.

■ Lastly, this court fails to see how Egbarin's claim that Laurito terminated him from his position as a financial advisor has any bearing on the question of whether Egbarin's work environment was hostile. A hostile work environment claim seeks to determine whether an employee's relationship with his supervisors was so offensive as to change the conditions of that employee's employment. See generally Harris, 510 U.S. at 21, 114 S.Ct. 367. Explicit, as opposed to constructive, termination, simply ends the period of employment. Without some evidentiary showing from Egbarin, this court cannot discern a basis to treat the Laurito's termination of Egbarin's employment as part of Egbarin's employment.[6]

5. Egbarin conspicuously never claims that he ever sought the position of field vice president. Nor does Egbarin provide evidence about the process by which one obtains the position of field vice president.

6. The uncontested evidence shows that Laurito took Egbarin outside the office in order to

■ Egbarin's hostile work environment theory is thus reduced to Laurito's denial of Egbarin's request to take ten consecutive discretionary vacation days and the Letter of Reprimand that became a permanent part of Egbarin's file after he illegally solicited business in Texas. As to this latter action, Egbarin has again failed to articulate any awareness during his time at AEFA that letters of reprimand were given on a discriminatory basis. Even if one can attribute discriminatory motives to Egbarin's remaining charge that Laurito denied Egbarin's vacation request because of Egbarin's race, this simply does not rise to the necessary level of severity required for hostile work environment claims. *See Williams,* 171 F.3d at 101 (finding no hostile work environment where "the proof at trial did not include the use of racial epithets or racially derogatory comments either directed at plaintiff or widely used in the workplace."). The defendants' Motion for Summary Judgment on this claim is therefore granted.

## B. Retaliation

This court next will address Egbarin's claim under Title VII and Section 1981 that the defendants retaliated against him for engaging in a known protected activity. Egbarin asserts that he took ten PTO days from work to protest Laurito's discriminatory requirement that Egbarin increase his productivity before accessing PTO days. Egbarin claims that he made Laurito aware of the grounds of his dissent when the two met on December 26, 2002 to discuss Egbarin's PTO request.[7] Egbarin Aff. ¶ 60. Because Egbarin chose to protest Laurito's actions, Egbarin claims Laurito fired him. The defendants counter that Laurito had a legitimate, nondiscriminatory basis for terminating Egbarin. Further, the defendants argue that Egbarin has failed to demonstrate that this legitimate, nondiscriminatory basis for termination was actually pretextual. As this court finds that, when viewing the record in its entirety, there is no evidence tending to show that the defendants' proffered reason for termination was pretextual, it grants the defendants' motion on this issue.

■ A plaintiff makes a prima facie showing of retaliation by establishing "participation in a protected activity known to the defendant; an employment action disadvantaging the plaintiff; and a causal

fire him. Egbarin attempts to suggest that Laurito admits to taking Egbarin outside because Laurito believed Egbarin to be violent. Egbarin's Opposition at 33 (citing Laurito Depo at 213–14). Egbarin further claims that Laurito never took any other advisors off-site for their termination meetings. *Id.* Even though Egbarin is black, this evidence does not establish a discriminatory basis for Laurito's handling of the situation. There is no evidence that Laurito only took black employees outside the office for termination meetings, and there is also no evidence that Egbarin even perceived Laurito's actions as discriminatory before filing his Opposition to Summary Judgment.

7. As noted above, Egbarin first asserts that he told Laurito that he was protesting allegedly discriminatory practices in an affidavit attached to Egbarin's Opposition to Summary Judgment. The defendants argue that Egbarin cannot present such evidence at this phase in the proceedings, especially because Egbarin's affidavit is arguably inconsistent with the email Egbarin sent to Laurito on December 26, 2002. That email, oddly enough, never mentions Egbarin's disagreement with Laurito's discriminatory policies. This court does not perceive, and the defendants do not provide, a legal basis for excluding Egbarin's submission on this point. *But cf. Perma Research & Dev. Co. v. Singer Co.,* 410 F.2d 572, 578 (2d Cir.1969) (prohibiting a party from creating a material issue of fact by submitting an affidavit that contradicts prior deposition testimony). Thus, Egbarin's affidavit will be considered competent evidence for this motion.

connection between the protected activity and the adverse employment action." *Quinn v. Green Tree Credit Corp.*, 159 F.3d 759, 769 (2d Cir.1998) (quoting *Tomka v. Seiler Corp.*, 66 F.3d 1295, 1308 (2d Cir.1995)). Within the context of Title VII and section 1983 claims, a " 'protected activity' refers to action taken to protest or oppose statutorily prohibited discrimination." *Cruz v. Coach Stores, Inc.*, 202 F.3d 560, 566 (2d Cir.2000) (citing 42 U.S.C. § 2000e–3). Here, Egbarin has made out a prima facie case of retaliation. He claims that he protested Laurito's racially discriminatory PTO policy, that Laurito was aware of the basis for this protest, and that Laurito fired him as a result of this protest.

▮ Since Egbarin makes out a prima facie retaliation case, the burden of production shifts to the defendants to articulate a legitimate, non-discriminatory basis for Egbarin's termination. *See Feingold v. New York*, 366 F.3d 138, 157 (2d Cir. 2004). The defendants have provided such a basis by stating that Laurito properly fired Egbarin for job abandonment. In support of this justification, the defendants point out that AEFA's company policies allow Laurito to exercise discretion with respect to PTO requests. Laurito exercised this discretion by determining whether an employee's requested PTO time was consistent with the business needs of the office. While PTO policy does not explicitly state that discretionary time off is subject to productivity restraints, other published AEFA documents establish the authority of managers to incorporate business needs into PTO approval. *See, e.g.*, Field Bulletin 4156A, Ex. LL to Rule 56(a)(1) Statement. In light of this discretion, the defendants argue that Laurito legitimately believed he was entitled to deny the PTO request based on the fact that Egbarin's job performance was barely above minimum standards.

After Laurito denied Egbarin's request, the defendants assert that Egbarin asked Laurito what would happen if he was absent from work without approval. Rule 56(a)(1) Statement at ¶ 143. Laurito replied that he would consider an extended absence by Egbarin to be job abandonment. *Id.* Because Laurito had authority to disapprove PTO requests and warned Egbarin that he would consider Egbarin's unapproved absence to be job abandonment, the defendants claim that Laurito properly terminated Egbarin for taking his trip to Nigeria. Based on this explanation, the court finds that the defendants have met their burden of providing a legitimate, nondiscriminatory reason for terminating Egbarin for job abandonment.

As the defendants have put forward an adequate justification for Egbarin's termination, the ultimate burden of proof rests with Egbarin to expose the defendant's stated rationale as pretext for unlawful discrimination. *See Feingold*, 366 F.3d at 157. Egbarin attempts to establish pretext first by arguing that Laurito had no discretion under the PTO policy to deny Egbarin PTO days. Egbarin does not even address in his submissions the separate documents the defendants cite in interpreting the PTO policy to allow for the consideration of business needs. *See* Field Bulletin 4156A, Ex. LL to Rule 56(a)(1) Statement; Memo to P1 Advisors re: PTO (Feb. 20, 2002), Ex. MM to Rule 56(a)(1) Statement. Egbarin also does not challenge Laurito's assertion that he warned Egbarin that he would consider an unapproved ten-day absence to be job abandonment. *See* Rule 56(a)(2) Statement at ¶ 143. Instead, Egbarin heavily stresses the fact that the State of Connecticut Employment Security Appeals Division found that Laurito's denial of Egbarin's PTO re-

quest was unreasonable. Even if this court accepts the Appeals Division's findings as probative on the issue of whether Laurito improperly dismissed Egbarin,[8] there is nothing in the decision to suggest that Laurito's actions were motivated by discrimination.

Egbarin also points to two white AEFA employees, Kelliher and Ruth Warner, who maintain that they were never required to meet productivity levels before obtaining PTO days. *See* Ruth Warner Depo. at 52; Kelliher Depo. at 62. These offerings are unpersuasive given the uncontested evidence in the record. For one, Laurito claims that he did in fact deny Kelliher a portion of Kelliher's requested PTO because Kelliher was not performing adequately. Laurito Aff. at ¶¶ 156—158. When Kelliher took the entire time off over Laurito's warning, Laurito fired him for job abandonment. Laurito Aff. at ¶ 161. In Kelliher's recorded conversation with Egbarin, the former addresses the issue of whether other employees have had problems with PTO denials by stating, "I never heard complaint from another employee about . . . being stopped from taking PTO. Your's was the only case I've ever heard *with the exception of mine.*" Kelliher Tr. at 62. It is undisputed that Kelliher is a white male. In Warner's case, Egbarin points to her deposition testimony that she never had to maintain a certain productivity level before taking PTO days. *See* Warner Depo. at 52. But Egbarin offers no substantive evidence to refute Laurito's assertion that Warner consistently operated at least 150% above mandated productivity levels. Laurito Aff. at ¶¶ 164–65. Egbarin also never refutes that his own performance was nearly substandard at the time he requested PTO days from Laurito.

Taking the record as a whole, and considering Egbarin's weak prima facie showing, there is not such evidence as would permit a jury to find that the defendants terminated him for discriminatory reasons. Thus, this court must grant summary judgment on Egbarin's retaliation claim.

## C. Disparate Treatment

■ The court now turns to Egbarin's disparate treatment claim. Analyzing whether the defendants subjected Egbarin to disparate treatment must be done under the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). *See Fitzgerald v. Henderson*, 251 F.3d 345, 356 (2d Cir.2001). The framework is functionally identical to the analysis of retaliation described above. The plaintiff is first required to establish a prima facie case of discrimination. *See Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 252–53, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). A prima facie case for disparate treatment is established by showing that 1) the plaintiff is a member of a protected class; 2) the plaintiff performed her job adequately; 3) the plaintiff suffered an adverse employ-

---

**8.** The parties agree that decisions of the Appeals Division are not binding upon this court. *See also* Conn. Gen. Sta. 31–244a(b) ("No finding of fact or conclusion of law contained in a decision of an employment security appeals referee, the board of review or a court, obtained under this chapter, shall have preclusive effect in any other action or proceeding, except proceedings under this chapter."). Moreover, the Appeals Division's findings in Egbarin's case seem especially tenuous. Most notably, the decision does not address the documents previously mentioned that strongly suggest that PTO was subject to management's prior approval. As is clear from the discussion above, these documents are central to the defendants' legitimate, nondiscriminatory justification for denying Egbarin's request for PTO. Thus, while the court will not fully review of the Appeals Divisions' decision here; it does find the probative value of this decision to be slight.

ment action (termination); and 4) that the adverse employment action occurred under conditions giving rise to an inference of discrimination. *Burdine,* 450 U.S. at 254, 101 S.Ct. 1089.

Once a plaintiff has established a prima facie case, a rebuttable presumption of discrimination arises, and the burden shifts to the defendant to offer a legitimate, non-discriminatory reason for its actions. *See id.* Upon the employer's articulation of a nondiscriminatory reason for the employment action, the presumption of discrimination that arises with the establishment of the prima facie case drops out. *See St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 510–11, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993). The burden then shifts back to the plaintiff to fulfill her ultimate burden of proving that the defendant intentionally discriminated against him in the employment action. *Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 143, 120 S.Ct. 2097, 147 L.Ed.2d 105, (2000). In order to satisfy this burden, the plaintiff may attempt to prove that the legitimate, non-discriminatory reason offered by the defendant was not the employer's true reason, but was a pretext for discrimination. *Id.*

A prima facie case combined with a showing that an employer's asserted justification is false is sometimes, but not always, sufficient to permit a discrimination claim to survive summary judgment. *Schnabel v. Abramson,* 232 F.3d 83, 89–91 (2d Cir.2000) (citing *Reeves,* 530 U.S. at 142, 120 S.Ct. 2097). The court must "examin[e] the entire record to determine whether the plaintiff could satisfy his 'ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff.'" *Schnabel,* 232 F.3d at 90 (quoting *Reeves,* 530 U.S. at 143, 120 S.Ct. 2097, 147 L.Ed.2d 105). The plaintiff need not show that sex or race was the only factor motivating any adverse employment actions she suffered in order to make a showing of employment discrimination. See 42 U.S.C. § 2000e–2(m); *Desert Palace, Inc. v. Costa,* 539 U.S. 90, 123 S.Ct. 2148, 156 L.Ed.2d 84 (2003). "The 'ultimate issue' in an employment discrimination case is whether the plaintiff has met her burden of proving that the adverse employment decision was motivated at least in part by an 'impermissible reason,' i.e., a discriminatory reason," regardless of whether the case is presented as one of single or dual motive. *Stratton v. Dep't for the Aging for New York,* 132 F.3d 869, 878 (2d Cir.1997).

For the first two prongs, Egbarin asserts that he is an African American who performed his job in a satisfactory manner during his employment with AEFA. The defendants do not dispute this proffer in connection with their Motion for Summary Judgment. Egbarin next claims that he suffered the following four adverse employment actions: 1) being denied PTO days in a discriminatory fashion; 2) being terminated for taking PTO days or being absent from work; 3) being issued a letter of reprimand that became a permanent part of the defendant's personnel file; and 4) being denied lucrative accounts when such opportunities were steered only to white financial advisors. In connection with their Motion for Summary Judgment, the defendants do not challenge the status of these actions as "adverse employment actions."

With regard to the fourth element of the disparate treatment test, Egbarin must show that these adverse actions took place under conditions giving rise to an inference of discrimination by proving that the defendants "treated him less favorably than a similarly situated employee outside his protected group." *Graham v. Long Island R.R.,* 230 F.3d 34, 39 (2d

Cir.2000). Egbarin must specifically show himself to be "similarly situated in all material respects" to the individuals with whom he compares himself. *Shumway v. United Parcel Serv. Inc.*, 118 F.3d 60, 64 (2d Cir.1997). The test for materiality asks whether Egbarin and the individuals against whom he compares himself were subjected to the same workplace standards and whether the conduct at issue was of comparable severity. *Graham*, 230 F.3d at 40 (citing *Norville v. Staten Island Univ. Hosp.*, 196 F.3d 89, 96 (2d Cir. 1999)). To determine whether Egbarin has met this requirement of the prima facie showing, this court will take Egbarrin's claimed adverse employment actions in turn.

### 1. Denial of PTO Days

 As with his retaliation claim, Egbarin's assertion that he was denied PTO days in a discriminatory fashion rests on the fact that Kelliher and Warner, both white AEFA employees, were not forced to meet productivity requirements before taking PTO days. For the same reasons outlined above, these comparisons do not create a genuine issue of material fact. *See* Ruling, *supra*, at § III(B) The undisputed evidence shows that Kelliher was fired for almost identical behavior.[9] And, because Warner was never in danger of falling below productivity requirements, her situation was not comparable to Egbarin's situation.

### 2. Termination for Taking PTO Days

Here, Egbarin argues that, while employees who are absent from work are normally given a verbal warning, a written warning, then a final warning before termination, Egbarin was given no such warning before his termination. The employees to whom Egbarin compares himself are Warner, Jeremy Trainor, Robert Francesca, Micheala Kim, and "Lyle." Laurito gave Francesca and Kim verbal warnings for missing one Saturday "phone clinic" a piece. Email from Laurito to Francesca (Sept. 5, 2002, 14:39 EST), Ex. 16 to Rule 56(a)(2) Statement; email from Laurito to Terrein (Nov. 4, 2002, 14:17 EST), *id.* Neither of these incidents seems remotely similar in severity to Egbarin's decision to take seven previously denied PTO and ten consecutive days off in total. Also, Matt Ellis issued a verbal warning to Lyle because Lyle insulted a former advisor on a phone call, not for missing work. This is in no way comparable to Egbarin's conduct, or the conditions under which his termination was imposed.

As for Warner, Egbarin's submissions also do not create a genuine issue of material fact. In her deposition, Warner vaguely admits that she took PTO days toward the end of 2002. Warner Depo. at 41–43. She then admits that Laurito only allowed her five PTO days toward the end of 2002. *Id.* at 47–48. However, Warner states several times that she does not remember how much time she actually took off in December of 2002. *See id.* at 46–50. Without evidence on this point, no trier of fact could find that Warner took more time without approval. Egbarin also asserts that, in 2001, Warner took more PTO days than was company policy at the time. *Id.* at 45. However, Warner testified that she bargained for her increased PTO when she initially began working for AEFA. *Id.* at 45–46. There is no evidence to dispute this testimony, and Egbarin

---

9. Under Second Circuit precedent, the fact that Kelliher was fired after Egbarin does not disqualify his termination from consideration. *See Graham* 230 F.3d at 41 (comparing individuals to the plaintiff whose relevant conduct occurred in the two years following the plaintiff's termination)

never challenges the propriety or existence of Warner's alleged bargain. Therefore, Warner's PTO situation in 2001 was subjectively different from Egbarin's situation in that she had explicit approval from management to take additional days.

With Trainor, Egbarin also does not present a genuine issue of material fact. Trainor allegedly missed two unannounced days of work on April 3 and 4 of 2002, but only received verbal warnings. Laurito Depo at 62. Trainor received additional warnings for missing work on April 16 and May 3, 2002. *Id.* at 61–66. Sometime in September of 2002, Laurito fired Trainor for not meeting attendance expectations. *Id.* at 65. In presenting Trainor as a comparison, Egbarin makes no showing whatsoever that Trainor was similarly situated in any material fashion beyond also being an AEFA employee in the East Hartford office. The evidence only shows that, while Egbarin missed ten consecutive days of work—seven of which were in blatant disregard of an explicit directive from Laurito—Trainor never missed more than two consecutive work days. Egbarin has failed to create a material issue of fact that there was on material similarity between his situation and Trainor's situation.

### 3. Discriminatory Reprimand

For this claim, Egbarin asserts that Kelliher and Turbridy, both white males, also solicited out of state business before they were licensed to do so. According to Egbarin, these individuals never received written reprimands for their activity. Looking at the evidence adduced, this court cannot accept Turbidy as similarly situated to Egbarin. Nothing in Turbidy's deposition indicates that AEFA was aware of the fact that Turbidy improperly conducted out of state business. *See* Turbidy Depo. at 73–85. There is also nothing in the record that could support a finding that Laurito had knowledge of any illicit dealings by Turbidy. If AEFA was not aware of Turbidy's activities, it could not be expected to react to them.

Kelliher is also not materially similar to Egbarin. Kelliher solicited out-of-state business in Massachusetts after Laurito approved his request to apply for a Massachusetts license. Kelliher Tr. at 32–33. Matthew Ellis, Kelliher's manager, then told Kelliher that Kelliher could solicit business in Massachusetts while the application was pending. *Id.* at 33. When Laurito discovered that Kelliher had in fact solicited business in Massachusetts before his application was approved, Laurito issued him a written warning. *Id.* at 41. There is no dispute that, at the time of Kelliher's warning, there was confusion within AEFA as to when a person with a pending application could solicit out-of-state business.

By contrast, Egbarin solicited business in Texas before Laurito even approved his request to apply for a license. To this, Egbarin claims that Laurito personally told him that Egbarin could not apply for a license in Texas unless Egbarin solicited business in the state. The truth of this assertion is immaterial because Kelliher explicitly denies that anything of this sort ever happened between he and Laurito. *Id.* at 34. Thus, Egbarin has not provided this court with a sufficient basis to conclude that he and Kelliher's situations were materially similar for the purposes of a racially disparate treatment claim.

### 4. Discriminatory Assignment of Lucrative Accounts

Egbarin's last basis for his prima facie case of discrimination is his assertion that the defendants steered lucrative contracts exclusively to white advisors. Only one such "steering" event is presented in the record. Apparently, an AEFA employee

named Liz Reilly assigned Ruth Warner contracts previously assigned to Don Johnson, a supervisor who had recently resigned. Kelliher Tr. at 65. According to Kelliher, Reilly improperly assigned Warner the cases that had not been submitted to the corporate office. *Id.*

The record is devoid of evidence which would support a finding that this incident was motivated by Laurito's discriminatory intent. Though Egbarin reported directly to Reilly at the time of his termination, there is no evidence upon which jury could conclude that Laurito in any way sanctioned Reilly's actions. As Kelliher states, Reilly simply removed Johnson's name from a document and added Warner's name. Kelliher Tr. at 65–67. Without more, there is no reasonable inference available upon which a fact finder could conclude that this incident in any way demonstrates that Laurito subjected Egbarin to disparate treatment.

Based on the foregoing, Egbarin is unable to establish his prima facie case of disparate treatment with respect to any of his proposed adverse employment actions. Therefore, the court grants summary judgment on this claim.

### D. Supplemental Jurisdiction

Because this court has granted summary judgment on Egbarin's claims under Title VII and Section 1983, there are no federal claims over which this court will exercise federal question jurisdiction. 28 U.S.C. § 1331. As there is no claim that this court may exercise diversity jurisdiction over the state claims, the court also dismisses Egarin's state claims. 28 U.S.C. 1367(c)(3) (authorizing the district court to dismiss supplemental state law claims when it "has dismissed all claims over which it has original jurisdiction"); *see also United Mine Workers v. Gibbs,* 383

U.S. 715, 725, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966).

### IV. CONCLUSION

Based on the foregoing analysis, the defendants' Motion for Summary Judgment (Doc No. 100) is GRANTED. The clerk is hereby directed to close the case.

**SO ORDERED.**